CHARLES J. SORENSEN, Appellant, v. OLGA KIRSTINE SORENSEN, Respondent.

Second Department, February 4, 1927.

Husband and wife — annulment of marriage — common-law marriage — defendant was married to third person in Denmark — parties to this action were married ceremonially in this country in May, 1900 — defendant's husband in Denmark procured royal decree of divorce in October, 1900 — under Danish law, defendant was then citizen of Denmark and jurisdiction existed over her to grant royal decree — parties to this action continued to live together for more than twenty years with knowledge of said decree — common-law marriage shown — plaintiff cannot attack validity of Danish decree — daughter of parties would become illegitimate if marriage were annulled.

This is an action to annul a marriage on the ground that the defendant was married to a third person at the time the parties hereto entered into a ceremonial marriage in May, 1900. The plaintiff cannot succeed in this action. The

defendant, prior to her ceremonial marriage to the plaintiff, was married to a third person in Denmark and after the marriage between the parties to this action the defendant's husband in Denmark procured a royal decree of divorce, which fact was known to the plaintiff herein. The evidence shows that the defendant herein was, at the time of the Danish divorce proceedings, domiciled in Denmark according to the laws of that country, although she was living in this country, and that jurisdiction was obtained over her so that the royal decree was legally rendered.

In view of these facts and the fact that the plaintiff knew of the Danish decree and continued to live with the defendant as her husband for more than twenty years, it is held that a common-law marriage arose as soon as the impediment was removed by the Danish decree.

Furthermore, the plaintiff cannot in this proceeding attack the validity of the divorce decree granted in Denmark.

A daughter of the parties who was born out of wedlock and was legitimatized by the common-law marriage would become illegitimate again if the marriage were annulled.

KELLY, P. J., dissents in part.

APPEAL by the plaintiff, Charles J. Sorensen, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Kings on the 1st day of February, 1924, upon the decision of the court rendered after a trial at the Kings Special Term, in an action brought to annul the marriage of the parties.

*William H. Good,* for the appellant.

*Richmond J. Reese* [*George C. Howard* with him on the brief], for the respondent.

KAPPER, J. The parties entered into a ceremonial marriage on May 25, 1900. In the month of February, 1901, a child was born of this marriage who is now living. Prior to said ceremonial marriage, defendant had intermarried with one Westerdahl, in Denmark. Westerdahl and the defendant were both natives of Denmark and were living there at the time of their marriage, which took place in 1891. In 1892 the defendant left Denmark and came to the city of New York and has since resided in the State of New York, with the exception of two or three short periods, not material to this controversy. Both plaintiff and defendant believed, although mistakenly, that the defendant was free to marry when she married the plaintiff. Their good faith is not impugned; nor does either claim that their relations which thereafter continued were in any wise meretricious. Westerdahl, as a citizen and native and continuous resident of Denmark, instituted proceedings in Denmark against the defendant to secure a decree of divorce by what is characterized in the record as a " royal decree," and such decree accordingly was granted on October 5,

1900. The decree was granted by the King of Denmark and declares that the marriage between Westerdahl and the defendant "hereby is absolutely dissolved, and that the husband shall be permitted to contract new marriage." It was not disputed that Westerdahl on February 27, 1900, duly petitioned the King of Denmark for a "divorce" from the defendant; and that the defendant appeared before the Danish Consul in New York city, and signed in his presence a paper whereby and wherein it was stated in effect that she did not controvert her husband's petition for divorce, adding thereto that her reason for leaving him was his failure to "support her;" and it is further admitted that on the basis of the petition and the defendant's signed admission, the King of Denmark granted the divorce decree. Plaintiff admitted that he saw this Denmark divorce decree in the year in which he and the defendant intermarried. It could properly be inferred from the testimony that each of these parties then believed the defendant free to contract another marriage, even though defendant was under disability when she entered into the ceremonial marriage with the plaintiff. What the parties to this action then did was to continue to live together as husband and wife, in the best of faith and in the full belief that they were competent to be and become remarried. This relation of ostensible husband and wife continued unbrokenly from 1900, the time of the Danish decree, until June, 1921. The letters which plaintiff sent the defendant during this period, particularly in 1907 and 1910, in which he addressed her and their daughter as " My darling wife and daughter," again " My own beloved wife and girl," again " My own dear wife and little girl," and " Dear Olga and Beulah " (these being the Christian names of the defendant and daughter) and which he signed " Your loving and longing husband Charles," which letters were sent on the occasions of defendant's temporary absence on visits, together with all of the testimony in the case, shows the most serious and solemn recognition by these parties of their avowedly legal status of husband and wife.

An attorney, expert in the laws of Denmark, and whose competency is conceded as well as whose testimony is undisputed, testified that the laws of Denmark recognize two kinds of divorce decree, one by judges, and the other by " royal decree; " that the paper signed by the defendant in the office of the Danish Consul in New York city was a proper appearance in the proceeding and gave jurisdiction to the Danish King to grant the divorce; that although the decree was silent as to the right of the defendant to remarry and expressly granted Westerdahl the right to remarry, a marriage into which she subsequently entered would be perfectly valid in

Denmark as a consent thereto would be merely perfunctory, and a failure to obtain consent would simply subject the one performing the marriage to " censure; " that the Danish decree was perfectly valid whether the wife consented to it or not and that this theory was based upon the fact that when the royal decree was granted the defendant was the wife of a Danish citizen, and her absence from Denmark would not change the status of her citizenship which continued to be the same as that of her husband.

It was found by the learned Special Term that the Danish decree was regular and that jurisdiction according to the law of Denmark was obtained over the defendant, and that such decree dissolved the marriage between Westerdahl and the defendant " and removed every impediment from that time on to the contracting by the defendant of a valid marriage." It was further found that the good faith of the parties being unquestioned, plus plaintiff's knowledge of the Danish decree at or about the time of its rendition, and the continued living together of plaintiff and defendant for so many years, created a common-law marriage between them by the establishment thereof on October 5, 1900, when defendant's disability to contract a marriage was removed by the Danish decree.

The learned Special Term rendered judgment dismissing the complaint upon the merits, and from that judgment the plaintiff appeals.

The appellant does not urge that a common-law marriage was not established by the proofs, provided the Danish decree removed defendant's disability. If, however, the appellant entertains the contrary view, we can only say on this evidence that the finding of a common-law marriage between these parties is not alone based upon ample evidence, but is without contradictory evidence. The subject of a common-law marriage entered into under similar circumstances was very fully discussed by Mr. Justice LAZANSKY in *Applegate* v. *Applegate* (118 Misc. 359), where it was held that such a relation would exist in law where the parties continued to live together for fourteen years after the death of a former husband from whom the wife had not been divorced, the present husband seeking an annulment on the ground that there was a former existing spouse at the time the parties ceremonially married.

Appellant's theory is that as the defendant " abandoned " Westerdahl in Denmark and came to New York, New York was her domicile, and that the purported jurisdiction of the Danish court or King was without extraterritorial effect or ineffective here. The evidence, as already pointed out, showed that the defendant's domicile was that of her husband in Denmark, notwith-

standing her presence here at the time. Much has been written on the subject of domicile, but it is not necessary in the view that I take of this case to enter upon a lengthy discussion of that topic. A wife may undoubtedly acquire a domicile separate and apart from her husband, but in the present case we have undisputed proof that, in so far as concerns the Danish decree, the domicile of the wife was that of her husband, a citizen of Denmark. At the least, the question of whether or not the wife was legally domiciled in Denmark at the time Westerdahl obtained his decree, was a question of fact and if there be an omission in the findings of the Special Term to proclaim this, we should make a finding accordingly and hold that the domicile of the defendant was in Denmark at the time the decree was obtained. Moreover, the rules of comity and private international law recognized in all civilized countries require recognition of the validity of the Danish decree in the circumstances of this case.

In *Le Mesurier* v. *Le Mesurier* (L. R. [1895] A. C. 517, 527) the Judicial Committee of the British Privy Council, per Lord WATSON, said: " When the jurisdiction of the court is exercised according to the rules of international law, as in the case where the parties have their domicile within its forum, its decree dissolving their marriage ought to be respected by the tribunals of every civilized country."

In *Hilton* v. *Guyot* (159 U. S. 113) Mr. Justice GRAY discussed the subject of " comity " at considerable length, and in the course of his opinion defined it as follows (p. 163): " ' Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws; " the learned justice further saying (p. 167): " A judgment affecting the status of persons, such as a decree confirming or dissolving a marriage, is recognized as valid in every country, unless contrary to the policy of its own law. *Cottington's case*, 2 Swanston, 326; *Roach* v. *Garvan*, 1 Ves. Sen. 157; *Harvey* v. *Farnie*, 8 App. Cas. 43; *Cheely* v. *Clayton*, 110 U. S. 701. It was of a foreign sentence of divorce, that Lord Chancellor NOTTINGHAM, in the House of Lords, in 1678, in *Cottington's* case, above cited, said: ' It is against the law of nations not to give credit to the judgment and sentences of foreign countries, till they be reversed by the law, and according to the form, of those countries wherein they were given. For what right hath one kingdom to reverse the judgment of another? And how can we

refuse to let a sentence take place till it be reversed? And what confusion would follow in Christendom, if they should serve us so abroad, and give no credit to our sentences.' ''

Our courts have recognized foreign rabbinical divorces '' upon grounds of comity or international law.'' (*Leshinsky* v. *Leshinsky*, 5 Misc. 495, 497; *Saperstone* v. *Saperstone*, 73 id. 631, 635.)

If in this case we start right, we shall reach a determination that accords with justice. Our start is not in the ceremonial marriage between plaintiff and defendant, but in their common-law marriage, contracted after the Danish decree was rendered. That decree, as already stated, was seen and fully understood by this plaintiff at the time of its rendition. He knew what it purported to accomplish, namely, that it removed the defendant's disability against remarriage. Both the plaintiff and the defendant regarded it as having the effect of permitting them to contract a marriage, which the law sanctioned by virtue of the facts disclosed. In the circumstances I do not think the plaintiff can be heard to attack the validity of the Danish decree. This does not proceed upon the theory of estoppel, but upon the ground that the attack on the decree must be made by the parties to it and cannot be made by the plaintiff, a second husband, claiming such decree, of which he had full cognizance, to be invalid.

In *Kinnier* v. *Kinnier* (45 N. Y. 535) the plaintiff sought to annul his marriage to the defendant upon the ground that a divorce obtained by her from a former husband was void for fraud practiced in obtaining it. Chief Judge CHURCH, in declaring the decree of divorce to be binding upon the parties to it, and that neither could assert that it was not a valid judgment as both were equally guilty of the fraud charged, said (p. 543): '' It effectually divorced the parties to it, and their marriage was no longer in force in any legal sense. The plaintiff in this action has not been defrauded, nor is he injured by it. The plaintiff was entitled to marry a marriage-able person, and though she may not have been, in other respects, all he anticipated or all that was desirable; yet she was competent to marry, because her former marriage was not *then in force*, and being competent, it is of no legal consequence to the plaintiff how she became so. Conceding fraud as alleged, he cannot avail himself of it. His success in this case would have no effect upon the status of the former husband, while the position of the defendant would be anomalous. By the judgment in this action, she would be declared the wife of her former husband, and by the judgment of another court, equally binding upon her, she would be declared not to be his wife. She could not claim marital rights from either husband, and it would be, at least, hazardous to marry another.''

In *Ruger* v. *Heckel* (85 N. Y. 483) it was also sought in an annulment action to declare a decree of divorce theretofore obtained by the wife as void for fraud and collusion. Judge DANFORTH, writing for the court, said (p. 484): " In bringing this action the plaintiff meddled with a matter which did not concern him. Before he contracted matrimony with Theresa, he was told of her former marriage, its dissolution and the terms thereof. He has had the full benefit of his bargain. No one has questioned his title, and the record which he produces shows a judgment binding upon both parties. It is impossible to discover any ground in law or morals upon which his complaint can stand. In refusing to listen to him the court does not aid in giving effect to a judgment obtained by fraud. It regards him as a suitor without a cause of action and rejects his petition, because he is not aggrieved. The parties to the judgment do not complain, nor does either of them ask aid from the court."

In *Hall* v. *Hall* (139 App. Div. 120), also an action to annul a marriage on the ground that the defendant wife had another husband living at the time of the marriage, and where the claim was made that a divorce obtained by her from the former husband was void for fraud, the court (per LAUGHLIN, J.) say: " Here the plaintiff and defendant both resided in Colorado and they first met there. At that time plaintiff knew that defendant was married. No fraud was committed against him. He wanted to marry her, and to authorize that it was necessary that she obtain a divorce. He understood that she obtained it. The divorce may be voidable, but it is not void for her fraud, nor could she avoid it on that ground. Her former husband, if living, may avoid it for her fraud, but he had not done so. If it should be duly annulled, the plaintiff may then be in a position to maintain an action to annul his marriage to the defendant, but he has no standing to avoid it for fraud, because he is not injuriously affected by it; but on the contrary, by virtue of it, he got just what he then wanted."

In *Rupp* v. *Rupp* (156 App. Div. 389), also an annulment action which sought to attack the validity of a divorce decree, we said (per RICH, J., at p. 390) that even if the divorce judgment was *collusive*, the judgment cannot be attacked collaterally by this plaintiff, the plaintiff not being " aggrieved " by the divorce decree.

It may be urged that some of these cases point out that the court granting the divorce decree had obtained jurisdiction of the parties. Even so, that to my mind, is not the basis for the rulings. An attack upon the judgment for fraud or collusion is just as strong

as the claim that the defendant was not brought within the jurisdiction by service of process. If the defendant in the divorce decree does not complain of that, then the second husband is in no position to make the claim where he had full knowledge of the decree, and no fraud was practiced upon him. As to the jurisdiction of the Danish proceedings, I repeat that the evidence amply established the fact that the defendant here, who in no wise complains of it, was duly subject to that jurisdiction and had duly appeared therein.

The appellant makes this statement in his brief: " The status and legitimacy of the daughter Beulah, in this case, who is now past twenty-one years of age, is absolutely assured, because both the parties have pleaded, and conceded, that as far as the plaintiff was concerned, the Sorensen marriage was contracted by him in absolute good faith, and under the provisions of section 1135, subdivisions 6 and 7, of the Civil Practice Act, it is assured that the status of the daughter, as a legitimate child, will be in all respects affirmed."

The plaintiff may have the best of intentions regarding his daughter, but he is mistaken in his view as to what would be her legal status in the event of his success in this suit. The child was born out of wedlock. The subsequent (common-law) marriage legitimatized her. The effect of an annulment decree which the plaintiff now seeks would throw the child back into her illegitimate status under the doctrine announced in *Matter of Moncrief* (235 N. Y. 390). Such an appalling consequence should be avoided, if possible. Of course, the plaintiff is not bound to consider the welfare of his daughter, if not so minded. In any event, it comports with the best sort of concept that the status of this daughter may be legally declared in this action to be that of a legitimate child.

The judgment should be affirmed, with costs.

MANNING, YOUNG and LAZANSKY, JJ., concur; KELLY, P. J., concurs in the opinion except as to the effect of the decision in *Matter of Moncrief* (235 N. Y. 390), referred to in the last clause thereof.

Judgment affirmed, with costs.