In the Matter of the Estate of CLARE A. BRIGGS, Deceased.*

Surrogate's Court, New York County, June 24, 1930.

---

Seacord, Ritchie & Young, for the contestant.

David M. Neuberger, for the respondent.

O'BRIEN, S. In this estate an application was made by the contestant in the probate proceeding for the appointment of a temporary administrator. The answer filed by the respondent disputed the status claimed by the contestant on this application, viz., that of testator's widow. Upon the hearings held to determine the preliminary issue thus raised, the following evidence was adduced: That decedent was divorced from Ruth O. Briggs in a proceeding brought by her in the Supreme Court of Westchester county; that the decree of divorce entered in that proceeding became final on June 4, 1929; that for several years theretofore decedent and contestant lived together and continued to so live until August 30, 1929, when they entered into a contract of common-law marriage in the State of New Jersey. The real estate operator who leased the farm at Bound Brook, N. J., to the decedent testified that on or about August 15, 1929, decedent and contestant called at his office, and the former executed the lease in the presence of the latter stating that " they were to be married and that was why they were taking the farm;" that he (the witness, Riley) visited the farm on a succeeding Sunday, about Labor Day, and

saw decedent and contestant there with the former's brother and wife; and that in a conversation with decedent the latter stated that he and the contestant were married. This witness' testimony as to the conversation at the time of executing the lease was corroborated by his business partner, Harold Meitzer. An attorney who had represented decedent in securing a modification of the terms of the separation agreement with his former wife, and in advising him on other matters including income tax returns, also testified in support of the common-law marriage. From his examination it appears that decedent was informed of the obstacles to a marriage in New York, and the possibility of effecting a common-law marriage in New Jersey. It further appears that a reason for decedent's avoiding a ceremonial marriage was the fear that the newspapers would " pick up the old divorce case " and that the paper with which he was employed would object. On cross-examination it was shown that this witness had a power of attorney from decedent under which he caused to be transferred at the direction of decedent some of decedent's insurance policies so that they became payable to his estate. Acting under the same power this witness testified that he transferred the ownership of the city apartment, occupied by decedent and contestant, to the latter, and also deposited for sale securities owned by decedent with the National City Bank, all at decedent's direction that he wanted his " wife to have it." Dr. Michael L. Landman, who was treating decedent at the time of these transfers, stated an opinion that the latter was then mentally able to comprehend the nature and purpose of all his acts. The telephone operator at the apartment house where decedent and contestant *lived as man and wife, identified Marie C. Briggs as the Mrs. Briggs who shared* the apartment with decedent, and said that they seemed to be " a very happy and charming couple." This testimony was corroborated in the main aspects by that of Frederick O. James, the agent in charge of the apartment house.

As to the effecting of the common-law marriage at Bound Brook, N. J., there were produced three witnesses, viz., Virginia Hammond, the maid who worked for the couple both before and after the taking over of the farm, Wilhelmina Schultz and her husband, Everett Schultz, who were the caretakers of the farm.

Virginia Hammond's testimony was as follows:

" Direct examination by Mr. Neuberger: Q. Where do you reside? A. 246 West 150th Street. Q. Do you live with anybody, relatives? A. My sister. Q. Did you know Mr. Clare A. Briggs in his lifetime? A. Yes, sir. Q. You also know the lady known as Marie C. Briggs, who is in court? A. Yes, sir. Q. You have been employed by her for some time and by him, too? A. Five years,

going on six years. By the surrogate: Q. By whom? A. Mr. Briggs. By Mr. Neuberger: Q. You lived with them in West 67th Street, No. 1? A. Yes, sir. Q. While they lived there? A. They first lived in 603 and then moved. Q. You lived with them in that building, did you? A. Yes, sir. Q. And in August, 1929, do you remember going anywhere with the lady known as Mrs. Briggs? A. Yes, sir. Q. To the State of New Jersey? A. Yes, sir. Q. To a farm called the Sunridge Farm? A. Yes, sir. Q. Was that before or after Labor Day? A. Before. Q. How many days before Labor Day? A. Two or three days, something like that. Q. Did you go there alone with her? A. Yes, sir. Q. You went there by automobile? A. Yes, sir. Q. A rented car? A. Yes, sir. Q. What time did you arrive there with her? A. Five o'clock. Q. Did you see Clare A. Briggs that day at that farm? A. Just about two hours afterwards, yes, sir. Q. He arrived there when? A. Mr. Briggs arrived about eight o'clock. Q. Who was with him, another gentleman? A. Yes, sir, another gentleman. Q. When he came in where were you? A. I was downstairs. Q. What did you do? A. I took the bags upstairs. Q. Whose bags? A. Mr. Briggs' bags upstairs. Q. Where was Mrs. Briggs? A. Mrs. Briggs was upstairs getting the bedroom ready for her guests and Mr. Briggs. Q. Now, then, she was in a bedroom? A. Yes, sir. Q. One bedroom? A. Yes, sir. Q. How many beds in that room? A. One. Q. What did you do when you went upstairs with the bags? A. I unpacked them. Q. Did Mr. Briggs come in the room? A. Mr. Briggs walked into the room and threw his arms around Maggie. Q. When he came into the room did you notice what he said or did? A. Yes, sir, I did. Q. You were unpacking the bags? A. Yes, sir. Q. What did he do? A. He walked over and threw his arms around her and kissed her and said, Maggie, you are the sweetest girl in the world. Q. He called her Maggie? A. Yes, sir, he called her Maggie always. Q. Did he say anything else? A. He said, Now I am making you my wife. Q. What did she do? A. She looked up and kissed him and cried and said, Clare, you make me so happy. Q. What else was said? A. He said, Virginia, and I said, yes, and he said, I want you as a witness that Maggie is my wife. Q. And what did you do? A. Well, I just said, yes, Mr. Briggs, and went downstairs. I had my work to do. Q. When did you first see me? A. Yesterday afternoon. Q. Were you asked by me to tell me what you knew? A. You asked me to tell the truth. Q. (Repeated)? A. Yes, sir. Q. Did you tell me then, yesterday, for the first time what you are telling here in court today? A. Yes, sir. Q. And you went downstairs? A. Yes, sir. Q. Did Mr. and Mrs. Briggs occupy the room that you have

spoken of as the bedroom? A. Yes, sir. Q. And all the time while they were at the farm? A. Yes, sir. Q. How long did Mr. Clare Briggs remain at the farm? A. I do not know exactly how long a time. A. About a week or ten days? A. A week or two weeks. I don't know. Q. Do you know where he went? A. He came back to New York. Q. Do you know where he went from New York? A. After he talked over the radio — he went to Baltimore. Q. Did you come back to New York? A. Yes, sir. Q. With Mrs. Briggs? A. Yes, sir. Q. How long afterward? A. I don't know exactly. Q. Did you come to New York after he had left? A. Yes, sir. Q. Or before? A. Afterwards. Q. Did you see Mr. Briggs again? A. When he came back from Baltimore. Q. Did you go to Baltimore? A. No, sir. Q. But after he came back from Baltimore you saw him? A. Yes, sir. Q. Did Mrs. Briggs go to Baltimore, if you remember? A. Yes, sir. Q. After he came back from Baltimore, did you notice whether they were together after that, Mr. and Mrs. Briggs, did you notice anything about them as to whether they quarreled or what their disposition was toward each other? A. They were two of the sweetest people together I ever saw in my life. Q. Did you ever hear him express any affection or love for her? A. Yes, hundreds of times. He told her always, ' Maggie, you are the sweetest girl in the world. I cannot live without you.' Q. After you came to New York with Mrs. Briggs did Mr. Briggs return from Baltimore, did he come to New York? A. Yes, sir. Q. Did you work for them there? A. Yes, sir. Q. And continued to work for them there? A. Yes, sir. Q. And you were in their employ at the time when Mr. Briggs went to the hospital in New York City? A. Yes, sir. Q. There was a time when Mrs. Briggs fell ill, too, do you remember, didn't she? A. Yes, sir. Q. And then you took care of the apartment? A. Yes, sir. Cross-examination by Mr. Young: Q. You have worked for Mrs. Marie C. Briggs five or six years? A. Yes. Q. What name did you first know her by when you first went to work for her? A. Mrs. Briggs. Q. Five or six years ago? A. Yes. Q. You never heard of her as Maggie Toohey? A. Yes, I heard it, but I knew her as Mrs. Briggs. Q. Where was it that you entered her employment? A. In 12th Street, 304. Q. Was Clare Briggs there at that time, too? A. Yes. Q. And ever since that time you have been in Marie C. Briggs' employ? A. Yes, sir. By the surrogate: Q. That was seven years ago in West 12th Street? A. About six. I don't know just how long. Q. Approximately? A. Yes, just something like that. By Mr. Young: Q. Were you a witness in the action for divorce? A. Yes. Q. And you testified about their living together in 12th Street. A. Yes. Q. Where did they move to

when they left 12th Street? A. 1 West 67th Street. Q. And they occupied first one apartment and then moved to another one? A. Yes, sir. Q. And all the time they went as Mr. and Mrs. Briggs? A. Yes. By the surrogate: Q. Did you say something about 603 West 112th Street? A. That was the first apartment they took for a while. Q. Seven years ago? A. No, sir, two and a half years ago. Q. Before they went to 1 West 67th Street? A. No. They took another apartment there. Q. I thought you said something about living at 603. A. That was the first apartment they lived in two years ago. Q. West 115th Street? A. No, sir. 603, in 1 West 67th Street. Q. The apartments have numbers? A. Yes. By Mr. Young: Q. You talked a great deal with Mrs. Briggs about this litigation over Mr. Briggs' will? A. No, she didn't talk to me. I am only a servant. She didn't talk to me about that, and I asked no questions. I am only her maid. I go there to work and not to ask her about her affairs, because they don't concern me at all. Q. Has she never talked to you about it? A. No, I didn't go there for that. I am a different kind of a woman. I don't visit around like that, but go to work, and I work. Q. Are you sure you have not? A. I said no, and that is what I said, no. I didn't go there for that. I said no. I am a woman, and I mean no when I say no. I am no child. When I say no I mean no. No man can make me say yes when I say no. Q. Did you know anything about this lawsuit before you came into court today? A. Not until yesterday. Q. Then what happened yesterday? A. Nothing happened. I got a subpoena to come. Q. Nobody said what they wanted you to talk about? A. No. The lawyer told me he wanted me to tell the truth and nothing but the truth, and I am a Christian, and that is all I do, to tell the truth. There is no use to lie. Q. You have not been hurt. A. I ain't going to be hurt, child. Q. You knew through the divorce action at that time that Marie C. Briggs was not his wife? A. I didn't know that, because men do such funny things, I don't know what they do. I didn't know it. Q. Did you think it? A. No, I didn't think it, because when I went there it was Mr. and Mrs. Briggs, and I continued to think it was. Q. And you still thought that they were Mr. and Mrs. Briggs when you went to court and testified when another Mrs. Briggs got a divorce? A. I didn't think nothing. I said what was what, just what I know. Q. You know a man cannot be married to more than one woman? A. I don't know. You see it in the papers lots of times that they are, child. Q. It did not strike you as being strange at all? A. No, indeed. Q. Many times during that five or six years you have heard Mr. Briggs speak endearingly to Mrs. Briggs, have you? A. What is that? Mr.

Neuberger: She wants you to talk plain English to her. Q. During that five or six years did Mr. Briggs speak to Mrs. Briggs in the same manner that you have described in New Jersey, many times? A. Very, very sweet all the time. Every time he came in that house he spoke to her so beautiful all the time. Q. And that place in 12th Street and the other apartments in 67th Street, the same? A. Yes, I must say that, too. Q. And many times you have seen him throw his arms around her? A. I certainly have. Q. And many times you have heard him tell her that she was the most wonderful girl in the world? A. He didn't say wonderful, but the sweetest. Q. There was nothing unusual about this performance in New Jersey? A. Well, I guess not. Q. Was that any different from any other time? A. No, just the same. Most always, why not? When a person is so nice all the time, it is the same to me. Q. Did he say anything in New Jersey that was different from any other time that you saw him with her? A. Oh, yes. He said, I make you my wife. Q. Had they ever talked about being man and wife before? A. Well, I don't know about that. They said lots of things, I don't know what they said. I ain't heard that because I was in the room unpacking. Q. You have been in the room lots times, haven't you? A. Sometimes. Q. (Repeated) — with them both there? A. No. Q. How many times? A. That particular time I was in there because they had just come to the farm. I had no occasion to unpack. They would come in the evening and I would be going home. Q. Did you ever go with them on trips anywhere? A. No. Q. Did you ever unpack for Mrs. Briggs when she came back from any trips? A. Sure; yes, I did. Q. And about how many times would you say that you have seen Clare Briggs throw his arms around her and tell her that she was the sweetest girl in the world? A. How could I remember that in six years? Q. Is it only a great number of times or only a few? A. A. Hundreds of times. Q. Can you remember every one of them? A. Why do you ask me such a question? How could I remember all of that in six years, while I am doing my work? Q. Can you remember what was said at any other time except this time in New Jersey? A. I was doing my work and I can't remember all the things he said to her. Q. How did you come to remember this one thing so clearly? A. Because he called me to the fact that he was saying it, and wanted me to be a witness. Q. Have you ever been at weddings? A. No, sir, I don't go to them. Q. Did you ever see anybody get married? A. No, I do not think I have. Q. What did you do after he said this to you, were you interested in it? A. I went downstairs to get dinner. Q. Did you tell anybody that Mr. and Mrs. Briggs had just been married and you were

a witness? A. I had no right to tell it. Who was there to tell? Q. Was it a secret? A. Who was there to tell? Q. Was anybody else there? A. There was a guest. Q. You saw Mr. and Mrs. Schultz, didn't you? A. They knew it. He had introduced them. Would I go and say, They just got married? Q. You mean there was no use in telling Mr. and Mrs. Schultz because he had already told them that they were married, had he? A. I didn't see no reason to tell him. If you go downstairs and introduce your servant to your wife, and another servant comes along and say that there is Mr. and Mrs. Briggs just got married, what would you think? Q. He told Mr. and Mrs. Schultz that they were married, didn't he? Mr. Neuberger: She said Mrs. Schultz. By Mr. Young: Q. You knew when Mr. and Mrs. Briggs first got there he introduced her as his wife? Mr. Neuberger: Objected to. This witness said that Mrs. Schultz told her that she was introduced as his wife. The witness: That is good. By Mr. Young: Q. Mr. Neuberger is right, is he? A. (No answer.) Q. Were you downstairs when the introduction was made? A. No, sir. Q. When you went downstairs after acting as a witness, did Mrs. Schultz tell you that they had been introduced as husband and wife? A. She told me that Mr. and Mrs. Briggs came downstairs and are they not nice. Q. What was said about their being married? A. Nothing. Q. Did she refer to them as Mr. and Mrs. Briggs? A. I guess she did not have to. She was working like I was. I didn't go down there to visit but to work. Q. Did you tell her about this ceremony, anything about it? A. I did not have any right to tell her. We were there working as the help. What right had I to go from one help to another talking about my boss and madam? I am no child. Why would I do such a thing? That is children's foolishness. Q. They came there as Mr. and Mrs. Briggs? A. Why, certainly. Mr. Neuberger: That is not fair. The witness testified that she went there with Mrs. Briggs and that Mr. Briggs came there with a gentleman two hours afterwards. Why assume that the witness said something else. By Mr. Young: Q. You did not say anything to anybody about that ceremony? A. I told you once. Q. I thought you spoke too. A. Certainly, I am no child. Q. And you have not talked with anybody about this until you talked to Mr. Neuberger? A. I had no right to. Q. Who told you that you had a right to talk to him about it? A. When I got the subpœna I knew I had to say something. Q. To the Court or to Mr. Neuberger? A. Right where I am sitting now. Q. And this is the first time? A. I didn't have to tell Mr. Neuberger what I knew. I can tell what I see with my eyes. Q. You did not tell him what you knew? A. What right had I to tell it? Here is where I have to tell it.

When you work for anybody that is when you know what to say. Nobody can make me say anything else. If you get up to tell a story you forget it, but if you tell the truth you can tell what you see with your own eyes, but if you try to say what somebody else says you make a mistake, and you can't make me make a mistake. You can stay there all night and you can't do that, I have nothing to do but answer your questions, and now what is it? Q. On all of these occasions Mr. Briggs threw his arms around her and told her that she was the sweetest girl in the world, and you do not recall any other occasion particularly but this one? A. I said hundreds of times. Why would you stand up there and tell me once? Q. What was the one before that? A. For six years, what one can I tell? Hundreds of times. When I say that, what one time can I tell you? Every time he came in the room he always did that. He did not come in and say, Hello, like many of you men do. He came in and kissed her and said, Hello, Maggie. Q. It was quite a common thing? A. (No answer.) Q. You did not pay much attention to it? A. I was there to open the door. If you had to open the door when he came in and she is coming to the door to meet him, you don't have to pay attention, but you see it with your own eyes for six years. Q. You didn't stand around to listen to what they had to say? A. I am there working and what they did did not interest me. Redirect examination by Mr. Neuberger: Q. This was the only and the first time that Mr. Briggs ever asked you to witness anything? A. Yes, sir. Q. That is why it is impressed indelibly on your memory? A. Yes. Q. Are you sure about it? A. Yes. Q. No question about it? A. No, sir. Q. When you called on Mr. Neuberger yesterday did he tell you, when you came to court you were subpœnaed to tell the truth, no matter whom it hurt or helped? A. Yes, sir. Q. And everything you have said here today is the absolute truth, is it not? A. Yes, sir. Q. As it occurred? A. Yes, sir. Q. Do you attend church? A. Yes, I do. Q. What church? A. St. Mark's."

Wilhelmina Schultz, the housekeeper at the farm in Bound Brook, testified that the contestant arrived at the farm on the Friday before Labor Day of 1929, with the maid Virginia Hammond; that decedent arrived about an hour later and went up to the room which he occupied with the contestant; that about one hour later they both came down to the kitchen where the witness and her husband were at the time, and decedent said to them, " Meet my wife, Mrs. Briggs; " and that they stayed at the farm together until September ninth. This testimony was corroborated by that of the husband, Everett Schultz.

A number of other witnesses were called, who testified as to the

behavior of decedent and contestant at their home in the city. They included personal friends who called on them at their home. All testified that decedent held contestant out as his wife, and that they appeared to be a happily-married couple.

The respondents contend that little weight should be given this latter testimony because the behavior described by these witnesses was characteristic of decedent and contestant prior to August, 1929, according to the admission of some witnesses. In view of the uncontradicted testimony of the contestant's principal witnesses, however, and the circumstances under which the decedent apparently found it necessary to go through the ceremony they described, the testimony in question has a bearing upon their actions, not only before but also after the common-law marriage. Decedent's peculiar position distinguishes this case from those wherein the presumption was indulged that illicit relations continue, and wherein it was held that such presumption can be destroyed only by clear and convincing proof of a subsequent marriage. The described fear of decedent that the publicity which would attend a public marriage to contestant might injure his standing in his profession, in view of his recent divorce, is readily understood. The case then comes within the rule stated in *Boyd* v. *Boyd* (252 N. Y. 422) wherein the court said (at p. 428): " The validity of any alleged common-law marriage is always open to suspicion. Especially is doubt justified when one of the parties is dead. Clear, consistent and convincing evidence is required to establish the fact. *This natural suspicion must, however, be dispelled when testimony, if reasonably believed, proves the existence of circumstances inconsistent with the absence of the alleged marriage.*" (Italics are writer's.) I find no reason to disbelieve the proof offered in this case of such circumstances.

In addition to the oral evidence there were introduced hospital records and telegrams sent to contestant by decedent. In the record from Johns Hopkins Hospital, made September 11, 1929, decedent's address was given as No. 1 West Sixty-seventh street, New York city. Under " name of relative or friend " was entered " Mrs. C. A. Briggs," and under " address of relative or friend," the word " same." The telegrams were addressed to Mrs. C. A. Briggs and expressed the hope to be home soon, and were written in most affectionate language.

Although all of the foregoing evidence clearly and convincingly established the claim of contestant to the status of common-law wife, and completely rebutted any presumption of continued meretricious relations, a most important bit of testimony in support of the claim came from a witness called by the respondents. On

cross-examination, Glen Briggs, the brother of decedent, testified as follows: " Q. You were at the farm and visited there?   A.  Yes, sir.   Q. You heard her called Mrs. Briggs, did you not?   A.  Yes. Q. And he held her out as his wife, didn't he, publicly held her out as his wife to people whom he knew?   A.  Yes.   Q. And he lived with her as his wife at the farm and at 1 West 67th Street?   A. Yes.   Q. There is no question about that fact, is there?   A.  No. Q. None whatsoever?   A.  None.   Q. They cohabited together as man and wife, and he held her out as his wife?   A.  Yes.   Q. Do you remember a conversation with him and her in the apartment at 1 West 67th Street before he went to the Neurological Hospital in which she said to him, What is going to become of me, or words to that effect?   Do you remember any such conversation?   A.  It was long before he went to the hospital.   Q. Do you remember something like that in substance?   A.  Yes.   Q. Do you remember somebody saying, Well, she is entitled to a third, anyway?   A. Yes.   Q. Who said that?   A.  My brother Clare.   Q. Clare said so? A.  Yes."   The witness then placed this conversation at the day before decedent went to Johns Hopkins Hospital.

The respondents offered very meagre proof in opposition to the proofs of contestant.   They called only three other witnesses — Reuben A. Lewis, decedent's son-in-law, who testified that he saw the decedent on August 30, 1929, and again early in November, and on these occasions decedent told him nothing of the marriage; Harry P. Stayton, decedent's syndicate manager, who testified that he was told nothing of the marriage, although the decedent referred to contestant as "Mrs. Briggs" several times in his presence; and Peggy White, decedent's secretary, who testified that decedent did not tell her of the marriage.   This testimony was weak indeed, in the face of contestant's uncontradicted evidence showing that there was a common-law marriage.   In *Matter of Biersack* (96 Misc. 161; affd., 179 App. Div. 916) the court quotes with approval the following rule: "When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of the proofs, the law raises a presumption of its legality, not only casting the burden of proof on the party objecting, but requiring him throughout and in every particular plainly to make the fact appear, against the constant pressure of this presumption, that it is illegal and void " (p. 178).

My determinations, therefore, are as follows: (1) That any presumption of continued meretricious relations was entirely and completely rebutted by the uncontradicted testimony as to the preparation for and consummation of the common-law marriage; (2) that the respondents have failed utterly to sustain the burden

cast upon them in attacking the said common-law marriage; and (3) the common-law marriage has been established. (*Gall* v. *Gall*, 114 N. Y. 109; *Hynes* v. *McDermott*, 91 id. 451; *Caujolle* v. *Ferrie*, 23 id. 90; *Sorenson* v. *Sorenson*, 219 App. Div. 344; *Graham* v. *Graham*, 211 id. 580; *Smith* v. *Smith*, 194 id. 543; *Matter of Brush*, 25 id. 610; *Matter of Smith*, 136 Misc. 863; *Matter of Seymour*, 113 id. 421; *Matter of Terwilliger*, 63 id. 479; *Townsend* v. *Van Buskirk*, 33 id. 287; *Procita* v. *Procita*, 190 N. Y. Supp. 21.)

No question has been raised as to the recognition by the State of New Jersey of a common-law marriage and counsel for contestant has cited New Jersey authorities to the effect that such marriages are recognized and upheld by the courts of that State. (*State* v. *Thompson*, 76 N. J. Law, 197; *Atlantic City Railroad Co.* v. *Goodwin*, 62 id. 394; *Chamberlain* v. *Chamberlain*, 68 N. J. Eq. 736; *Schaffer* v. *Kreskovnikow*, 89 id. 549; *Bey* v. *Bey*, 83 id. 239; *Jackson* v. *Jackson*, 94 id. 233.)

It is contended by the respondents, however, that contestant was incapable of contracting the marriage because of the following facts: Contestant was married to one Harry Chatman in New York some time prior to 1922. On April third of that year she secured a decree of divorce from him, based on her complaint that she was unable to live with him by reason of his habitual drunkenness and his cruelty towards her. Said decree was made by the Superior Court of Allen county, State of Indiana. The papers in that proceeding show that Harry Chatman was then residing in New York, and was served by publication. It is conceded that he did not appear in the action. The respondents claim that these circumstances prevent the courts of New York from recognizing the divorce. It is true that the Supreme Court of the United States had held that under such circumstances no State is constrained to give full faith and credit to a decree rendered by a sister State, although any State, in the exercise of comity, *may* give full faith and credit to such a decree (*Haddock* v. *Haddock*, 201 U. S. 562). It is also true that New York, in cases where the parties had their matrimonial domicile here, has adopted a public policy whereby it refuses comity and declines to recognize the validity of such decrees (*Olmstead* v. *Olmstead*, 190 N. Y. 458; affd., 216 U. S. 386; *Winston* v. *Winston*, 165 N. Y. 553; affd., 189 U. S. 506; *People* v. *Baker*, 76 N. Y. 79). But a reading of these cases shows that such policy was adopted for the benefit of New York citizens who refused to be bound by the foreign decrees. As stated in *People* v. *Baker* (*supra*, at p. 84): " But that judgment cannot push its effect over the borders of another State, to the subversion of its laws and the defeat of its policy; nor seek across its bounds

the person of one of its citizens, and fix upon him a status, *against his will and without his consent*, and in hostility to the laws of the sovereignty of his allegiance." (Italics mine).

On this trial the examination and cross-examination of the contestant brought forth the following facts: That when she left Harry Chatman she went to her former home with her parents at Fort Wayne, Ind.; that after she had begun the divorce action, he called on the long distance phone and asked her to discontinue it; and that several months after the decree was entered, viz., August, 1922, he married another woman who subsequently divorced him in Kings county, N. Y. A copy of the judgment roll in this latter proceeding was marked in evidence herein. It is thus established that the Indiana decree was accepted as valid by both parties to the proceeding in that State. The second marriage of Chatman has been confirmed by the Supreme Court of this State. This, then, is not a case in which to apply our rule of public policy, which was adopted for the protection of citizens of New York who refuse to be bound by a foreign decree (*Kelsey* v. *Kelsey*, 204 App. Div. 116). Of our authority to make exception to the rule there can be no question. As was said in *Hubbard* v. *Hubbard* (228 N. Y. 81, 85): "Whether or not the operation of a foreign decree of divorce in a given case will contravene the policy or wrong or injure citizens of the state is exclusively for its courts to determine. They are the final judges of the occasion on which the exercise of comity will or will not make for justice or morality."

However, respondents have missed the real and primary question involved, which is not what should be the attitude of the New York courts with respect to the eligibility of contestant to enter into a common-law marriage, but rather the question whether the respondents have sustained the burden of proof imposed upon them when they attack the common-law marriage entered into in New Jersey. We have held that the evidence clearly and convincingly establishes a common-law marriage of decedent and contestant in the State of New Jersey. The burden rests upon the respondents to prove that a valid common-law marriage could not have been entered into in that State by decedent and contestant. (See *Hynes* v. *McDermott*, 91 N. Y. 451, and the learned and exhaustive opinion of Surrogate Wingate in *Matter of Smith, supra.*) They have failed completely to sustain that burden.

Submit decree on notice dismissing the objection that contestant was not the wife of decedent and setting down the application for appointment of a temporary administrator for hearing at twelve-forty-five p. m. on Thursday, June 26, 1930.