In the Matter of the Estate of BERNARD F. CALLAHAN, Deceased.

Surrogate's Court, Kings County, November 23, 1931.

*Frederick W. Sparks,* for the petitioner.

*William Furie,* for Commercial Casualty Insurance Company, respondent.

WINGATE, S. Bernard F. Callahan died, a resident of Kings county, on July 26, 1929. His nearest blood relatives were nephews and nieces, with some of whom he resided at the time of his death. Administration on his estate was granted to one of these nephews within a month following his death upon a petition which recited that the decedent died intestate, unmarried and childless. The appointee duly qualified by filing a bond with the Commercial Casualty Insurance Company as surety. He then proceeded with the collection and marshaling of the assets, and within six months after the decease distributed the net estate without any accounting.

The petitioner bases her prayer for relief on the allegation that she was ceremonially married to the decedent on January 16, 1905. On the trial she introduced into evidence a duly authenticated marriage certificate, certifying to this fact, and produced one of the witnesses to the ceremony, who testified to its performance.

The defense of the respondents was directed, *first,* to a rather half-hearted attempt to disprove the fact of the marriage, and *second,* to an effort to demonstrate its invalidity by reason of a presumed prior marriage of the petitioner.

For the first purpose several witnesses were produced, who testified to a long acquaintance with the decedent, that they had never known the petitioner, and had never heard the decedent say that he was married. Respondents offered in evidence certain election records for the years 1920, 1923 and 1925, indicating that statements had been made by the decedent at the time of registering for voting to the effect that he was unmarried or a widower. Objection was made to the competency of these records and they were received subject thereto. Whereas, substantially self-serving declarations of this type are entitled to scant consideration when opposed to direct proof, the court is of opinion that they are admissible for what they are worth (*Washington* v. *Bank for Savings in the City of New York,* 171 N. Y. 166, 175; *Farmers' Loan & Trust Co.* v. *Wagstaff,* 194 App. Div. 757, 760, 761; *Matter of Reinhardt,* 95 Misc. 413, 419; *Matter of Salvin,* 106 id. 111, 112; cf. *Tracy* v. *Frey,* 95 App. Div. 579, 593), and they have accordingly been considered in reaching a conclusion.

On the second branch of the defense the defendants proved partially by documentary and testimonial evidence, and partly by an examination of the petitioner before trial, that in the years 1903 and 1904 the petitioner had known an individual by the name

of Robert Morkel, and that he was the only person with this surname whom she had known. On certain occasions during these years she used the name of Flora Morkel. It was also demonstrated that during this period she had been registered at a hospital under this name, and had given birth to two children, who had subsequently died, one of whom she had surrendered by instrument in writing, signed by her in this name. In response to an inquiry as to whether she had ever had any action brought against her, she testified that she had never had any lawsuits. It further appeared that the decedent and the petitioner had not lived together since about 1906.

Directly questioned on the subject of whether or not she had been married or had ever lived with Robert Morkel, she testified directly in the negative. This testimony was taken subject to objection, a ruling thereon being reserved. The objection to this testimony was merely a general one of incompetency, the competency of the witness not being directly challenged. The precise ground of objection which respondents had in mind is indicated only by their argument based on certain language of this court in *Matter of Smith* (136 Misc. 863) where this court determined that on an issue as to the legitimacy of her children, a mother was an incompetent witness to bastardize them. If this was the only ground of objection in the present case, the Smith decision is obviously an inapplicable precedent. The issue here is not one of legitimacy, since no rights of any children are involved, and in any event the effect of this testimony would not be to bastardize the children, since the question was directed merely to the relations, if any, of the witness with a particular named individual. If a broader view of the objection be taken, and it be considered to relate to the general competency of the witness herself, it is difficult to find any sound basis therefor.

The rules respecting competency of witnesses are set forth in sections 346 *et seq.* of the Civil Practice Act. Section 346 reads as follows:

" § 346. Exclusion of witness by reason of interest. Except as otherwise specially prescribed, a person shall not be excluded or excused from being a witness, by reason of his or her interest in the event of an action or special proceeding; or because he or she is a party thereto; or the husband or wife of a party thereto, or of a person in whose behalf an action or special proceeding is brought, prosecuted, opposed or defended."

The succeeding sections of article 33 set forth the exceptions, expressly referred to in the first clause above quoted, to this general rule. Section 347 relates to personal transactions or communica-

tions between the witness and a decedent or a lunatic. Obviously the query here propounded was in no respect a personal communication with this decedent. It was directed to transactions between her and an independent third party. Section 348 supplies merely an exception to the inhibitions of section 347.

Section 349 refers only to the testimony of one spouse against another in an action for absolute divorce and prohibits such testimony to prove anything beyond the fact of marriage and the non-existence of adultery. That this section has been strictly limited to the particular situation covered by its language, is demonstrated by the familiar fact that one spouse is fully competent to testify in an action against the other, for a separation or anulment of marriage.

The remaining sections of this portion of article 33 are directed merely to the regulation of testimony of individuals in certain specified confidential relations.

Whereas the obvious interest of the witness in the subject-matter is so great as to materially impair the weight of her testimonial assertions, the court is of the opinion that the testimony and witness were both competent on the issues of this case, and that the analogy to similar testimony in an action for annulment should be applied.

As a result, the objections both to the admission of the election records and to the statement of the petitioner of the non-existence of marriage or other relation between her and Robert Morkel are overruled, and the testimony has been considered by the court in reaching its conclusion.

When confronted with the marriage certificate of the petitioner and the testimony of a witness of this ceremonial marriage, the evidence of the individuals who stated that they had not known petitioner as the wife of the decedent, and that the latter had never stated that he was married, is entitled to no consideration whatsoever as proof of the fact of non-marriage. This applies also to the statements of the decedent in the election records. The demonstrated fact of the early cessation of the marital relations between the petitioner and the decedent indicates that the union was not one to the decedent's liking, and was an event in his life which he would gladly forget. The election statements were, in any event, unsworn and were respecting matters substantially irrelevant to the matter then in hand. They were not consistent among themselves and are hardly better than self-serving declarations in any event. It must, therefore, be determined that as a result of the proof of the ceremonial marriage by the petitioner, the burden of proof, or to use the phrase of Professor Wigmore, " the risk of non-persuasion " on the general subject, passed from the petitioner to the respondents, to demonstrate the invalidity of this marriage.

Such invalidity could be shown only by a demonstration that one or the other party thereto was, at the time of its celebration, debarred from entering into the relation. Respondents elected to make this attempted demonstration in respect to the petitioner. No direct proof of a prior subsisting marriage was adduced, but respondents press upon the court a series of inferences from facts demonstrated, which they assert lead to such a conclusion.

The first presumption invoked is that of legitimacy. It is urged that it having been demonstrated that the petitioner had two children prior to her marriage to the decedent, the court must presume that such children were legitimate. It is contended that if this presumption be indulged, it would follow that their father must have been legally married to the petitioner at the time of the conception of the children. This point having been reached, respondents further ask the court to presume that such presumed legal husband continued to live from the time the second of the two children was conceived until the 16th day of January, 1905, when the ceremonial marriage between the petitioner and the decedent took place. According to the record of birth of the second child, this event occurred on May 9, 1904. Adding a period of gestation to the time which elapsed between the date of birth and the marriage with the decedent would require the court to presume that the presumed husband of the petitioner continued to live from approximately August, 1903, until January 16, 1905.

The difficulty with the subject of " presumption " in the law, which text writers have frequently met in theory and the bench and bar have experienced in practice, is, in the opinion of the court, largely due to a failure to analyze the elements present in the particular instances thereof presented for application. A common definition of a presumption in legal terminology is: " The inference of a fact on proof of circumstances that usually or necessarily attend such fact." (Standard Dict. 1930 ed.)

That such a definition does not cover the entire field, in the present-day application of the principle, is obvious from the mere statement of the most commonly applied presumption to the effect that " every man is presumed to know the law." Many text writers, when faced by this obvious inconsistency, have taken refuge in the position that this particular presumption is not really a presumption at all, but a rule of law. While this may be a fact, when the subject is reviewed from one angle, any such result leaves the general subject of the evaluation and potency of presumptions in a chaotic state and continually remits the individual to the solution of the perplexing problem of when a presumption is not a presumption.

It is believed, however, that some light may be cast on the question by an analysis of the elements which enter into some of the more familiar " presumptions," and their relation to governmental functions and rules of human conduct in a given community.

The basic theory of popular government is liberty under the law. The chief function of government is the maintenance of order, permitting full liberty of action and preservation of life and property to the individual so far as this is compatible with the like rights of others in the same community. This is the fundamental thought underlying all law. In so far as any particular rule of law promotes these ideals or inhibits action subversive of them, it is natural and proper. To the extent that it contravenes them, it is an excrescence on the general body of the law. In a primitive community the basic rights of the individual do not require extensive regulations. Each person is entitled to live and to the enjoyment of his possessions. His obligations to the community are correspondingly slight. He must not interfere with the similar basic rights of his neighbors and in addition is merely under obligation to see to it that those peculiarly associated with him do not become a burden on others. If the Decalogue be analyzed with this thought in mind, it will be seen that its inhibitions go little, if any, further than this.

Each member of a small tribe or community will, as a matter of course, know the few simple rules which necessity has imposed upon him for the common good. Proof of such knowledge is unnecessary, since its possession is inevitable from his membership in the community; the inference is inescapable that he knows, once his membership in the tribe is established. It is a fact which need not be proved; it is presumed.

In this connection, however, another element intrudes itself upon the consideration of the subject, in the form of the function of government. Whereas in the primitive community it is a fact that every member does know the general rules of conduct — the law — there would be no possibility of ordered social intercourse if he did not; the primary function of government of preservation of the rights of each member could not be promoted and performed were any other theory to be adopted. There is a general public interest in the maintenance and perpetuation of the principle since its absence would render the enjoyment of individual rights impossible.

As the community becomes more complex, the rights and concomitant obligations of each of its members are correspondingly increased. A time will inevitably arise where such privileges and duties have multiplied to a point where it is inevitable that certain

of the rules of conduct of the community are not actually known to each individual member. Just where that point will be reached in each particular case is a question which a government, necessarily dealing with the people as a whole, and not with individuals as such, cannot accurately determine. Nevertheless the public interest in the rights and obligations of the members of the community remains the same. When such a time does arrive a conflict between the public interest and the dictates of pure logic is inevitable. Obviously the latter must yield. This, however, involves no variation from the basic principle which is at the foundation of the rule, that every member of the community is in fact familiar with the rules of personal conduct which have been established. This fact is demonstrated by the adjudications which determine that even this fundamental presumption is inapplicable to a member of another community who is actually unfamiliar with the local law. (*Doll* v. *Earle*, 65 Barb. 298, 302; affd., 59 N. Y. 638; *Bank of Chillicothe* v. *Dodge*, 8 Barb. 233, 237; *Matter of Welton*, 141 Misc. 674.)

The basic principle of the presumption is not, however, altered by the change in conditions. It is still founded on the same logical inference from the established fact that the individual is a member of the community. The substantially universal application of the presumption is due, however, to the public interest involved in, and consequent upon, the application of the inference, and it is this which gives it the controlling force which it possesses.

Whereas, however, the public policy involved in the presumption of knowledge of the law is of the highest possible order, there are other familiar examples of presumptions which involve the general good in a more or less inferior degree. Familiar examples are the presumption of innocence in criminal proceedings, of the validity of a clearly proven marriage, and of the legitimacy of a child where his status as such is in issue. In evaluating these various presumptions the nature and extent of the applicable public policy must be weighed.

Since the protection of the life and liberty of each member of the community is one of the primary purposes of government, is is obvious that where either is directly threatened every reasonable safeguard should be accorded the individual. Conformity to recognized standards of conduct is the usual and customary action of every member of the community. Therefore, the inference of innocence is logical. More than that, the noted obligation and purpose of government of protection injects into any proceeding which would deprive the individual of his basic rights the additional element of public policy. This gives rise to the presumption of

innocence in criminal proceedings, as a result of which no man can be deprived of life or liberty unless the propriety of so doing is established beyond a reasonable doubt. That the injection of this additional element is the determining factor in the potency of the presumption is demonstrated by the fact that in its extended form it applies only to criminal proceedings where the life or liberty of the individual hangs in the balance, and is not to be invoked in cases of a purely civil nature. (*Kurz* v. *Doerr*, 180 N. Y. 88, 91, 92.)

Obviously on a basis of logical deduction the inference is just as strong that a man has not set fire to the barn of another when he is called to answer for so doing in a civil action as when he is tried for arson. In the former case, however, the fact need only be proved by a preponderance of the evidence, while in the latter it must be demonstrated beyond a reasonable doubt. The difference lies in the public policy involved in the latter case — in the fact that certain fundamental rights of the individual are in jeopardy, which rights the State is bound to see protected until it has been established beyond reasonable doubt that the individual has forfeited the right to such protection.

It is a matter of public policy that the institution of marriage should be protected as tending to social quiet and the strengthening of the State; hence the presumption of validity of a *de facto* or ceremonial marriage. Common experience indicates that such a relationship probably is valid, but the extraordinary potency of the presumed validity is due not to this natural sequence but to the public interest involved in an affirmative determination.

It is in the interest of the State that each individual be unhampered in attaining the greatest possible personal success compatible with the rights of others. Unjust as it may be, one born out of lawful wedlock has the fault of his parents attributed to him " even unto the third and fourth generation." It is, therefore, in the interest of the State to see to it that this stigma is not placed upon one of the members of the community without the fullest possible proof. The logical inference is that a child of a *de facto* or ceremonial marriage is legitimate, but here again the potency of the inference from familiar and customary experience is reinforced by public policy. As in the presumption of innocence, however, these other presumptions are potent only when the issue is one involving the obligations of government or the interest of the community as a whole. If the issue on trial is not one which directly involves these considerations, the more powerful ingredient of the presumption disappears, leaving merely the original logical inference founded on human experience. But an inference is merely a

deduction of fact to be considered with other facts which may, as in all cases of adduction of facts, strengthen or weaken the inference as the case may be. It is unquestionably this thought which the court had in mind in *Matter of Meehan* (150 App. Div. 681), when it said (at p. 684): " The law indulges in presumptions from the necessities of the case in the absence of sufficient evidence to establish the fact to be proved. While the known facts may be insufficient of themselves to justify a particular inference, they may tend to weaken or strengthen a particular presumption. There can consequently be no ironclad rule, and, as the surrounding circumstances of different cases are rarely the same, precedents in this class of cases can rarely be controlling."

As a result of this discussion and analysis, it is the opinion of the court that an inference is a deduction of fact on proof of circumstances that usually or necessarily attend such fact, but that a presumption is an inference respecting a matter in issue in which a question of public policy is involved.

Viewed in this manner, the solution of the present problem is readily attained. The petitioner has clearly demonstrated the solemnization of a ceremonial marriage between herself and the decedent. This gives rise to a true presumption of its validity. Not only is there present the logical inference thereof by reason of the common experience of mankind, but there is a distinct and definite public policy to this effect which has been emphasized in innumerable adjudications.

In *Matter of Biersack* (96 Misc. 161; affd., 179 App. Div. 916) the following appears (at p. 166): " The expression of Lord COTTEN-HAM in *Piers* v. *Piers*, 2 H. L. Cas. 233, has frequently been adopted and applied:

" His words were: ' A presumption of this sort, in favor of marriage, can only be negatived by disproving every reasonable possibility. * * * You should negative every reasonable possibility.'

" A presumption like unto that which assumes legitimacy is also indulged in behalf of a second marriage, even though children, the fruit thereof, are not involved. There it finds its impulse in the law's jealousy for the order of society."

Among the many cases containing similar statements it will suffice to cite the following: *Clayton* v. *Wardell* (4 N. Y. 230, 237, 238); *Matter of Meehan* (150 App. Div. 681, 682, 684); *Smith* v. *Smith* (194 id. 543, 548, 554); *Matter of Tyrrell* (115 Misc. 714, 715; affd., 198 App. Div. 1001); *Matter of Goode* (188 N. Y. Supp. 188, 189, not officially reported; affd., 204 App. Div. 877); *Graham* v. *Graham* (211 id. 580, 583); *Matter of Briggs* (per O'BRIEN, S.,

138 Misc. 136, 148; affd., 232 App. Div. 666); *Nesbit* v. *Nesbit* (3 Dem. Sur. 329, 331, 332); *Johannessen* v. *Johannessen* (70 Misc. 361, 364, 365); *Matter of Grande* (80 id. 450, 457); *Matter of Salvin* (106 id. 111, 112, 113); *Matter of Rossignot* (112 N. Y. Supp. 353, not officially reported).

The facts in many of these cases were strikingly similar to those in the case at bar. Two decisions which seem rather out of line with this overwhelming weight of authority are *Matter of Hamilton* (76 Hun, 200, 208) and *Lazarowicz* v. *Lazarowicz* (91 Misc. 116). The latter is, however, merely a determination in an action of annulment and any authority which the former may have possessed other than on its precise facts appears to have been eliminated by the subsequent determination in the same department in *Matter of Meehan* (150 App. Div. 681, 682, 683).

Turning now to the respondents' side of the case, they base their position on the proved fact of the birth of the two children to the petitioner and argue therefrom that these children were legitimate as a result of the " presumption " of legitimacy; that, therefore, petitioner must have been married; that having been married, the " presumption " arises that her husband continued to live during the eighteen months which presumably elapsed between her conception of the second child and the marriage to the decedent, and that, therefore, at the time of such marriage she was not competent to marry, in consequence of which she committed bigamy by so doing, and her marriage to the decedent was void. That courts will go to great lengths to uphold the legitimacy of children *where that question is an issue in the case* has been noted and is unquestionable. This court demonstrated that fact fully in *Matter of Smith* (136 Misc. 863), in which there are cited substantially all the authorities in this regard to which respondents call attention. Here, however, the *issue* is the validity of petitioner's ceremonial marriage; a determination on this question could not by any possibility affect the status of these prior-born children even if they were alive, which is not the case. It follows, therefore, from the analysis of the subject hereinbefore attempted, that there is no presumption of legitimacy in this case. There is an inference to that effect to be weighed with other facts and inferences, but that is all. The so-called presumption of continuance of life is also merely an inference on the terminology hereinbefore adopted. Other inferences are the improbability of immoral conduct by petitioner and that she did not commit the crime of bigamy when she ceremonially married the decedent. The most important consideration of all, however, is the true presumption that the definitely demonstrated ceremonial marriage was legal.

It might be possible to dispose of the respondents' contention, which is a house of cards constructed of successive inferences, in the words of the Court of Appeals in *Lamb* v. *Union Ry. Co.* (195 N. Y. 260, 266): " It is a well-settled rule of law that you cannot base inference upon inference. (*O'Gara* v. *Eisenlohr*, 38 N. Y. 296; *Ruppert* v. *Brooklyn H. R. R. Co.*, 154 N. Y. 90.) Every inference must stand upon some clear, direct evidence, and not upon some other inference or presumption."

A more satisfactory solution, however, would appear to follow an application of the principle enjoined in *Matter of Irving* (198 App. Div. 414, 416): " In weighing evidence it is a fundamental rule that all the evidence should be harmonized if possible and that each part thereof should be considered in reference to the entire testimony and so as to bring about a consistent result. And it is particularly important that such a construction be placed on the evidence if it is reasonably possible to do so as will avoid the imputation of crime to any person. If two constructions are equally suggestive one of which implies crime or moral turpitude and the other is free from such implication, the latter should by all means be adopted."

Adopting this principle, all of the facts and inferences in the case can be harmonized by the supposition that the petitioner married some one, identity undisclosed, prior to 1903, to whom she bore the two children, now deceased; that such husband died at some time prior to January 16, 1905, on which day she ceremonially married the decedent. Whether or not such were really the fact, will never be determined. Suffice it to note that the respondents have utterly failed to demonstrate that which it was their obligation to prove, that the ceremonial marriage was not in all respects valid. (*Matter of Tompkins*, 207 App. Div. 166, 167, 168; *Romps* v. *Romps*, 209 id. 832.)

The contention of the respondents that the petitioner is estopped to challenge the unlawful diversion of the property belonging by law to her, which was appropriated by others without notice to her and without any action or knowledge thereof on her part, cannot be seriously considered so long as the Fourteenth Amendment to the Constitution of the United States remains in effect.

The application herein by the surety for affirmative relief against the administrator and the persons to whom distributive shares of the estate were paid is premature. The administrator must first account before the several liabilities of the parties can be determined.

In view of the not inconsiderable unnecessary labor imposed upon the court by the failure of both parties to conform to the provisions of rule 235 of the Rules of Civil Practice and the cor-

responding rule of this court which has been continuously published in the *Law Journal* for over a year, the attention of counsel is especially directed to them.

The letters of the administrator will be revoked and administration granted to the petitioner. The removed administrator will file and proceed to settle his account within thirty days.

Proceed accordingly.