In the Matter of the Estate of JOHN MAGUIRE, Also Known as JOHN J. MAGUIRE, Deceased.

Surrogate's Court, Kings County, November 23, 1936.

*John J. McManus,* for Dennis W. Corrigan, as executor.

*Callaghan, Stout & Nova,* for the claimant, objectant, Agnes Tierney, as administratrix of Mary Maguire, deceased, wife of decedent.

*Gregory, Stewart & Montgomery* [*Charles G. Stevenson* of counsel], for Helen M. Smith and Edna M. McNulty, as residuary legatees of the decedent.

WINGATE, S. The essential facts underlying the present controversy are wholly undisputed. John Maguire entered into a contract for the purchase of the premises known as 5524 Eighth avenue, Brooklyn, on September 28, 1921. He was at that time unmarried, but about two weeks later intermarried with Mary Connolly Maguire. Title to the property was taken on October twenty-first, at which time the record conveyance was made to John and Mary as husband and wife. As a result, they became tenants by the entirety of the property in question. (*Torrey* v. *Torrey,* 14 N. Y. 430, 431, 432; *Matter of Klatzl,* 216 id. 83, 86, 88, 90; *Matter of Lyon,* 233 id. 208, 211; *Matter of Baffa,* 139 Misc. 298, 299.) Concededly, the entire consideration for the acquisition of the property was paid by John from his own funds.

On February 25, 1929, John and Mary executed a contract for the sale of the premises to one Manson for a total consideration of $31,500, payable $1,000 on signing the contract, $15,500 on closing title, which was set for April 1, 1929, and the balance of $15,000 by taking the property subject to an existing mortgage for that sum. The initial $1,000 was duly paid.

Mary died intestate on March 8, 1929, survived by her husband and by three children of a prior marriage, the last named of whom are in essence the present claimants and objectants.

Title under the contract was conveyed by John on April third. He then received the remainder of the purchase price amounting to $15,500. No part of this sum was ever paid by him to the estate of his deceased wife or to her statutory distributees, nor was any claim ever made against him in his lifetime in this regard. He died on November 10, 1935, and letters testamentary were issued on his estate on November 18, 1935.

On February 21, 1936, letters of administration on the estate of the deceased wife were sought and secured by one of her children by the former marriage for the express purpose of presenting to and prosecuting against the estate of John a claim for one-half of the moneys received by him on the sale of the Eighth avenue property. Such a claim was filed against his estate and promptly rejected, and its validity on these demonstrated and conceded facts is the question here submitted for adjudication.

John's estate has, *inter alia*, interposed a defense to the effect that the rights of Mary, if any ever existed, in fact, are barred by operation of the Statutes of Limitation, and this position will receive preliminary attention. It is predicated on the provisions of section 57 of the Civil Practice Act.

It has been noted that Mary died on March 8, 1929. If any cause of action in respect to the purchase price of the property in question ever accrued to her or her estate, it must have been by reason of the acts which occurred on April 3, 1929. Letters of administration were not issued on her estate until February 21, 1936, which was sixty-one days short of seven years after the happening of these critical events. It is accordingly contended that even if she or her estate actually initially possessed some rights in the purchase money, these are barred by reason of failure of timely assertion. Strange as it may appear, section 57 of the Civil Practice Act does not appear ever to have been made the subject of direct interpretive adjudication in the fifty-nine years during which it and its similarly worded predecessors have been a part of the statutory law of this State. The present parties are in violent disagreement as to its meaning and effect.

In the opinion of the court, this divergence of opinion is due to a failure to read the section in conjunction with the ordinarily applicable limitation upon the institution of an action of this nature as contained in section 48, and in the light of the adjudications, made thereunder, which the enactment was designed to alter.

It is obvious that if any cause of action ever arose by reason of the receipt and personal appropriation by the husband of the total moneys paid under the contract, its basis was "upon a contract obligation or liability express or implied" which, under ordinary circumstances, must be prosecuted within six years from the date of accrual thereof. On this theory, the money, when received by the husband, belonged to the wife or her estate, to the extent of one-half thereof.

At the time the events transpired upon which the alleged right of recovery must depend, there was, however, no person in existence by whom the right of action against the husband could have been

enforced. The wife was dead and no personal representative of her estate had been appointed. In this situation, in the absence of section 57 or its predecessors, it was thoroughly established that no cause of action " accrued " within the connotation of section 48, by reason of the performance of the critical actions, since " the cause of action did not accrue until the letters of administration were granted, until there was some one in existence to whom * * * the debt was due, or who had a right to demand the thing." (*Bucklin* v. *Ford,* 5 Barb. 393, 397. See, also, *Everitt* v. *Everitt,* 41 id. 385, 393; *Sanford* v. *Sanford,* 62 N. Y. 553, 555; *Cohen* v. *Hymes,* 64 Hun, 54, 56.)

In accordance with this rule, the time would not begin to run against the enforcement of a right until the cause of action " accrued " and such accrual could not take place until the appointment of a personal representative of the estate which possessed such potential right. Obviously, after the action had " accrued " by virtue of the appointment of such personal representative, recovery upon the claim would be barred by limitation only upon the expiration of the six years' period specified in the statute. In other words, such a claim could never become barred until the expiration of six years after the appointment of the representative which latter event might occur one, ten or one hundred years after the happening of the critical act or event which gave rise to the particular right in favor of the estate.

All which the first sentence of section 57 purports to do is to substitute a limitation upon the second wholly indefinite period. The decisions noted, plus section 48, gave six years from the " accrual " of the cause of action within which to institute a proceeding for its enforcement but provided that such accrual should not take place until letters had been issued. Section 57 substituted an arbitrary period of six years for the latter indefinite period measured by the event, with the result that the cause of action shall be deemed to have accrued within six years from the death, thus starting the running of the usual statutory period. In practical effect, therefore, the result of the section is to give twelve years less one day from the death of the testator or intestate for the enforcement of such a claim in the event that letters are never in fact secured, or six years from the issuance of letters, if these are actually obtained within six years from the date of decease.

In the present instance letters of administration were issued on February 21, 1936, which was almost seven years subsequent to Mary's death. It would follow, therefore, that under section 57 letters must be deemed to have been issued, for the purpose of the Statute of Limitation, " within six years after the death of the

* * * intestate," or on March 7, 1935, on which date the statutory period must be deemed to have begun to run under section 48. It would not expire until six years thereafter, or in other words, action brought at any time prior to March 7, 1941, would be timely. The defense of outlawry of the main portion of the claim must, therefore, be overruled.

It appears to be conceded, however, that any claim for participation in the $1,000 down payment made during Mary's life is barred by the running of the usual statute, and this is correct. (*Adams* v. *Fassett*, 149 N. Y. 61, 68; *Sanford* v. *Sanford*, 62 id. 553, 556; *Matter of May*, 160 Misc. 497, 501.)

Before entering upon a consideration upon the merits of the legal questions here at issue, it may not be inappropriate to consider briefly the basic theory and reasons underlying the peculiar nature of tenancy, namely, by the entirety, which was constituted by the original conveyance to John and Mary.

The wish of the owner to direct the manner of devolution on his death of his material possessions is merely a manifestation of one of the strongest of human instincts. Zoologists have frequently asserted that " self-preservation is the first law of nature," and many of the basic tenets of modern law are predicated upon this thesis. It may well be doubted as an empirical matter, however, whether this impulse or instinct possesses any stronger force for the motivation of action than the inclination to take appropriate action for the protection and advancement of the welfare of spouse and children or other dependents of a prospective decedent.

The law which, in its essential character, has ever been responsive to human wishes in so far as these have not indicated potential tendencies detrimental to the common good, has readily assimilated itself to the purposes and inclinations of the community in effectuating their lawful intentions.

Unquestionably the most common mode of accomplishing the devolutionary purpose present in most people has been by formal testamentary instrument, but in respect to individual items of property, both real and personal, *inter vivos* acts for the accomplishment of like ends, have from time to time achieved legal recognition. Prominent in this connection are tenancies by the entirety in respect to specific parcels of real property, and so-called " Totten trusts " and bank accounts in statutory survivorship form, in connection with personalty.

In these and certain additional instances, the outstanding added characteristic of tenure which has been added to the usual incidents of *inter vivos* ownership, is that which effects devolution of the subject-matter to a designated individual upon the death of the

one who, but for the peculiar characteristic of the ownership, would be the sole possessor thereof.

Judged by the criterion of ordinary probabilities as deduced from the observation of human behavior, it would appear undeniable that the only purpose ever inducing a husband to have title to real property taken in the name of his wife as well as his own, is to assure its automatic devolution to her in the event of his predecease of her, thus satisfying in part the noted basic human impulse to make at least partial provision for the future welfare of a natural dependent.

Were the usual principle of *cessante ratione legis, cessat et ipsa lex*, to be applied in the present connection, the foregoing observations would be determinative against the propriety of a recovery by the claimant, since it is unbelievable that when John invested his own money in the matrimonial domicile and had its title taken in a manner which would secure the perpetuation of a roof over his wife's head if he predeceased her, he had any purpose, even remote, of making a compulsory donation in any contingency to her adult children by a former marriage. Unfortunately for basic theories, however, laws have a way of developing in unexpected directions, often contrary to their primary conceptions and purposes, and the question must be investigated as to whether the case at bar presents an instance of this variety.

The respective rights of John and Mary in the Eighth avenue property immediately prior to the signature of the contract of sale on February 25, 1929, are clear and uncontroverted. By the original conveyance to them, " each became seized of the entirety, *per tout, et non per my*, and upon the death of either the whole survived to the other " (*Bertles* v. *Nunan*, 92 N. Y. 152, 156. See also, *Matter of Klatzl*, 216 id. 83, 86), provided the essential nature of the tenancy remained unaltered until the happening of such event. During the continuation of the tenancy and the continued life of both, each of the spouses was entitled to use and occupation of the premises. Each could deal fully with his own share therein, both as to use during their joint lives, and as to contingent survivorship rights in the whole. (*Hiles* v. *Fisher*, 144 N. Y. 306, 315, 316. See, also, *Matter of McKelway*, 221 id. 15, 19; *Matter of Weiden*, 144 Misc. 854, 861; affd., 240 App. Div. 716; revd. on other grounds, 263 N. Y. 107.)

Upon the execution of the contract of sale to Manson, each contracted to convey to the vendee such complete rights possessed by him and her, which, as noted, were, in respect to each, the right to enjoyment of a moiety during the continued joint lives of both, and a contingent right in fee depending on the eventuality of death.

Viewed from this standpoint, it is obvious, as events transpired, that there was a total failure of consideration for any payment for the conveyance, so far as Mary was concerned. She purported to sell two things, namely, *first*, enjoyment of a moiety during the continued lives of herself and her husband, and *second*, her survivorship rights after her husband's death. The vendee received neither, wherefore on ordinary principles of equity, it is difficult to see why her estate should receive a tangible return when she in fact gave nothing in consideration therefor.

It is primary and thoroughly established in the law, that upon the execution of a contract for the sale of real property, the land becomes the equitable property of the vendee, while the vendor or vendors hold the legal title merely as trustees for the purchaser, and as security for the performance of his contractual agreements. (*Thomson* v. *Smith*, 63 N. Y. 301, 303; *Williams* v. *Haddock*, 145 id. 144, 150, 152; *Matter of City of New York* [*Edgewater Road*], 138 App. Div. 203, 207; affd., 199 N. Y. 560; *Sasso* v. *Meachem Realty Corp.*, 242 App. Div. 853, 854.) Upon his performance of his obligations, he is entitled to receive a conveyance from the person or persons in whom the bare legal title resides at the moment. If this has devolved to heirs at law in the ordinary processes of intestate succession, these will be compelled to make the conveyance (*Thomson* v. *Smith*, 63 N. Y. 301, 303) and the obligation in this regard is wholly unaltered if the title has chanced, in the interval, to pass to a surviving tenant by the entirety. (Cf. *McArthur* v. *Weaver*, 129 App. Div. 743, 745.) In either case, the possessor of the legal title holds it merely as a trustee for the vendee, in a manner similar to that of one who holds possession under a mere escrow agreement affecting personal property. He must convey it upon the performance of the stipulated terms, but this obligation is wholly different from and carries with it no necessary implication of personal rights in the consideration required to be paid by the vendee as a condition precedent to his right to demand the conveyance.

An understanding of the rights of the respective vendors must be sought in the agreement of sale itself, since by reason of its execution, the tenants by the entirety have, in effect, exchanged their rights in the land, with its various incidents, for the personal obligation of the vendee to make certain specified payments on designated dates. In substance, the right in this regard differs in no particular from any other chose in action as, for example, a purchase-money mortgage which might have been given had title actually been conveyed (*Matter of Baum*, 121 App. Div. 496, 497; *Matter of Blumenthal*, 236 N. Y. 448, 454), and like any other

obligation of this variety, it is purely personal property and must be governed, so far as its devolution is concerned, by the usual rules applicable in respect to property of this nature. In the ordinary case, whereas the heir at law will be compelled to convey to the vendee the real estate which he holds on a naked trust or in quasi escrow, yet he is entitled to receive no part of the purchase price payable as a condition to the conveyance. This like all other personal property of the deceased vendor, passes to his personal representatives. (*Lewis* v. *Smith,* 9 N. Y. 502, 510; *Thomson* v. *Smith,* 63 id. 301, 303.)

In an effort to ascertain the method of devolution of the chose in action, namely, the right to the purchase price, which came into existence on the execution of the contract of sale, the terms of the contract giving rise to the new right are important. This is in usual title company form, reciting that John and Mary are the sellers and that the purchaser agrees to pay the specified consideration at the times and in the modes particularly set forth. The recipient or recepients of this consideration are not expressly stated, wherefore it must result that the obligation for payment inures to the benefit both of John and Mary. What rights did they, respectively, receive as a result of this document? They did not become tenants by the entirety therein, since the law does not recognize the possibility of a tenancy of this nature in personal property (*Matter of Albrecht,* 136 N. Y. 91, 94, 95; *Matter of Mc Kelway,* 221 id. 15, 18; *Matter of Blumenthal,* 236 id. 448, 454), and all of which they held beneficially after the signature of the contract was the right *in personam* against the vendee which was thereby created. The contract did not expressly declare that their ownership of the obligation was to be joint, wherefore it must be held to have been a tenancy in common. (Real Prop. Law, § 66; *Matter of Kimberly,* 150 N. Y. 90, 93; *Matter of Blumenthal,* 236 id. 448, 453.)

This determination of the nature of their tenancy is, however, far from decisive of their respective resulting rights on the demonstration of the present case. Where persons are tenants in common, a factual inference, frequently loosely termed a presumption (*Matter of Callahan,* 142 Misc. 28, 35, 36; affd., 236 App. Div. 814; affd., 262 N. Y. 524), arises that they are equally entitled to the avails of the property so held. (*Bell* v. *Golding,* 136 N. Y. Supp. 278, 281; reported by memo. only, 151 App. Div. 945; affd., 211 N. Y. 507; *Jackson* v. *Moore,* 94 App. Div. 504, 507; *Yax* v. *Yax,* 125 Misc. 851, 852; affd., 217 App. Div. 714.) This inference, like all other factual inferences, " may of course be rebutted if the facts show that equitably they should hold in different shares." (*Perrin* v. *Harrington,* 146 App. Div. 292, 296.) It follows that

"a court of equity may take into account the amounts invested in the property by the respective tenants in common, in determining the shares thereof to which they are entitled," (*McGreggor* v. *Walters*, 133 Misc. 24, 26.)

Whereas neither the diligence of counsel nor the independent research of the court has disclosed a directly pertinent precedent in the Court of Appeals on this phase of the subject, its quotation with approval (*Matter of Blumenthal*, 236 N. Y. 448, 452, 453) of the statement of Mr. Justice BURR (*Matter of Kaupper*, 141 App. Div. 54, 57) that there is a presumption of equal interest "*in the absence of other evidence of intent*" (italics not in original), would seem to give a strong indication of its acceptance of the doctrine of *Perrin* v. *Harrington* (*supra*), particularly in view of the careful note in the *Blumenthal* opinion (p. 451) of the absence in that case of any evidence to contradict the inference.

In the case at bar the court is not under a like handicap. The moneys which furnished the primary purchase price of the chose in action were wholly furnished by the husband, and there is nothing in the record to indicate that he intended to make a present gift of any part thereof to the wife. He did intend that if the property were retained until his death, his wife, if the survivor, should receive the fee in partial solution of his natural obligation to her as a dependent. Such is the only natural inference to be drawn from his acts. This may not be metamorphosed or extended into an indication of an intent to make a present outright gift to her of one-half of the value of the property. The natural inference is to the contrary. (*Nay* v. *Curley*, 113 N. Y. 575, 578; *Matter of Williams*, 157 Misc. 458, 460; *Matter of Greenberg*, 158 id. 446, 448; *Matter of Gray*, 160 id. 710.)

It follows that the avails of the contract were the sole property of the husband, and that the wife's children by her former marriage received no interest therein either directly or through the medium of her estate.

The objections to the account will, accordingly, be overruled, and the claim for participation in the purchase price of the sale of the realty dismissed on the merits.

Enter decree on notice in conformity herewith.