Van Graafeiland, Circuit Judge, dissented with opinion.

**Charles FISHER, Plaintiff-Appellee,**

v.

**FIRST STAMFORD BANK AND
TRUST COMPANY,
Defendant-Appellant.**

**No. 59, Docket 84–7258.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 18, 1984.

Decided Dec. 20, 1984.

David E. Schancupp, New Haven, Conn. (Philip R. Shiff, Law Office of Shiff & Schancupp, New Haven, Conn., of counsel), for plaintiff-appellee.

David M. Cohen, Stamford, Conn. (Stephen A. Finn, of Wofsey, Rosen, Kweskin & Kuriansky, Stamford, Conn., of counsel), for defendant-appellant.

Before VAN GRAAFEILAND and CARDAMONE, Circuit Judges and Mac-MAHON, District Judge.*

* Honorable Lloyd F. MacMahon, United States District Court Judge for the Southern District of New York, sitting by designation.

**CARDAMONE, Circuit Judge:**

We affirm a judgment for plaintiff and reject his employer's attempt to avoid its obligation under a stock option contract. In an attempt to set aside the agreement defendant argues that its principal officer lacked authority to enter into such an agreement, that the contract was not supported by adequate consideration and was not in writing, that legal conditions precedent to its performance had not occurred, and that to enforce a stipulation against it made by its counsel in open court subjected it to manifest injustice. One who obtains performance from another while maintaining an option to refuse its own performance obviously views the bargain as a "heads I win, tails you lose" bet. Arguments supporting that inequitable supposition contravene the "policy of preventing people from getting other people's property for nothing when they purport to be buying it." *Continental Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 271, 29 S.Ct. 280, 296, 53 L.Ed. 486 (1909) (Holmes, J., dissenting), and will not carry the day in court.

## I

In 1971 Norman Reader, with the help of others, including plaintiff Charles Fisher, organized the First Stamford Bank and Trust Company. Each of the founders received five-year options to purchase shares of the Bank's common stock. Reader was the principal organizer and president. Recognizing that Fisher was well-known in the community and active in Stamford civic and religious organizations, Reader sought his help in getting this small banking institution off the ground. Fisher was appointed vice-president and became the Bank's first employee. He established the Bank's presence in the community by soliciting accounts, doing public relations work, and assisting in the opening of branch offices for the small accounts that the Bank was organized to serve. The Bank conceded that he was a valued employee.

In January 1976 plaintiff decided to move to Florida for health reasons. Before departing, Fisher had a conversation with Reader during which Reader allegedly offered him an option to purchase 1,000 shares of the Bank's common stock at $20 per share in exchange for his promise to perform services during the summer and fall of 1976 in connection with the Bank's opening of a contemplated new main office. As a consequence, Fisher returned to Stamford in July 1976 and began work as the Bank's consultant, helping with the opening of the new office until he returned to Florida in November. He was paid $4,000 for his services and expenses.

On June 8, 1976, just prior to his return to Stamford from Florida, the Bank's shareholders passed a resolution authorizing its board of directors to grant stock options to plaintiff and certain other employees. Fisher's option was to enable him to purchase 1,000 shares of the Bank's common stock at $20 per share until December 31, 1981. The board of directors never acted on the stockholder resolution.

In July 1979 plaintiff learned of an impending sale of the Bank's assets to People's Savings Bank and attempted to exercise his stock option. The Bank rejected his tender of $20,000 for 1,000 shares of its stock. At the time of the offer, the stock was selling for $23 per share. Shortly after the completion of sale of the Bank's assets to the larger bank, the price of defendant's stock rose to $77 per share.

Plaintiff thereupon filed a diversity complaint in the United States District Court for the District of Connecticut (Gagliardi, J., sitting by designation), seeking damages for breach of the stock option agreement. At trial, the parties agreed to submit two questions of fact to the jury as follows:

Has plaintiff established by a preponderance of the evidence that the Bank agreed in 1976 to grant plaintiff an additional option to purchase 1000 shares of the Bank's common stock at $20.00 per share until December 31, 1981 in exchange for plaintiff providing certain services to the Bank?

If "Yes," then ...

Has plaintiff established by a preponderance of the evidence that plaintiff had fully satisfied all of the terms and conditions of such agreement at the time he attempted to exercise the option in 1979?

The jury answered both interrogatories in the affirmative. The trial judge thereafter decided all other issues of law and fact and entered judgment for plaintiff in the amount of $57,560 pursuant to the parties' stipulation on damages. The Bank appeals claiming that: (1) Reader lacked authority to enter into a stock option contract with plaintiff; (2) the concededly oral contract was barred by the statute of frauds, and not supported by adequate consideration; (3) Connecticut law relating to stock options rendered the contract invalid; and (4) the trial court erroneously computed the damages.

## II

■ The Bank, citing Connecticut statutory law that authorizes a corporation to issue stock options entitling the holders to purchase them only "on such terms as the board of directors may determine", Conn. Gen.Stat. § 33–344(a), argues that a stock option offer made by Reader as president, without action by the board of directors is unauthorized and unenforceable. Nonetheless, a board of directors may ratify its president's unauthorized action. 2 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 773 (perm. ed. 1969). Whether principal ratified its agent's unauthorized act is generally a question of fact decided by a jury. *See Slotkin v. Citizens Casualty Co.,* 614 F.2d 301, 317 (2d Cir. 1979), *cert. denied,* 449 U.S. 981, 101 S.Ct. 395, 66 L.Ed.2d 243 (1980); *E. Paul Kovacs & Co. v. Alpert,* 180 Conn. 120, 126, 429 A.2d 829, 832 (1980) (nature and extent of an agent's authority is a question of fact). The Bank urges that the trial judge's failure to instruct the jury on ratification was reversible error. It concedes nonetheless that before trial the parties expressly agreed that the jury would consider only whether a contract existed and whether plaintiff had fulfilled his part of the agreement. The parties also agreed that "all

remaining questions will be left for the Court as questions of law as to whether or not there was estoppel, whether or not the agreement would come within the Statute of Frauds and as to whether or not the bank was authorized to grant the option without stockholder approval." In light of the parties' agreement to submit only those specified questions to the jury to be decided by it in the form of a special verdict, defendant's argument fails.

■ In ruling on defendant's judgment n.o.v. motion, Judge Gagliardi concluded that the board's ratification could be inferred from a number of facts in the record: Reader's position as president and director; his assurances to plaintiff that the stock option would be "taken care of"; and the shareholder's resolution prior to plaintiff's return to Connecticut from Florida. But the trial judge incorrectly viewed this evidence "in the light most favorable to plaintiff." Had ratification been submitted to the jury, plaintiff would have been required to prove it by a preponderance of the evidence. Usually the jury decides questions of fact and, on a motion for judgment n.o.v., the judge reviews the jury's conclusions in a light most favorable to the non-movant. *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 573 (2d Cir.1982). By reviewing the ratification issue in the light most favorable to the plaintiff, the trial judge acted as if the jury had actually determined the ratification issue, which of course it had not. In effect, the trial court viewed the ratification issue as though it had been waived by defendant. While we could remand for Judge Gagliardi to rule again, it is unnecessary to do so in light of the facts he relied upon. The totality of the circumstances in this case amply demonstrate that the board of directors ratified Reader's act. *See Cohen v. Holloways', Inc.,* 158 Conn. 395, 409, 260 A.2d 573 (1969).

## III

■ The Bank argues that the stock option agreement was invalid for lack of con-

sideration. We disagree. Fisher's performance of consulting services to assist the Bank in opening its Bedford Street main office constituted completion of his side of the bargain and as such fully supported his insistence that the Bank complete its side of the bargain and grant him the promised stock option. The Bank further contends that as a matter of law the agreement was not sufficiently definite as to its material terms to be entitled to enforcement. The first question submitted to the jury fully covered this issue. The jury found that the agreement sufficiently defined the obligations of the parties. Hence, Judge Gagliardi properly rejected this argument.

■ We turn next to whether the Statute of Frauds, Conn.Gen.Stat. § 42a–8–319, barred the oral agreement between Reader and Fisher. As the jury found that plaintiff had fully performed his promise under the agreement, the defense that this oral contract is barred by the statute of fraud is unavailing. In general, a contract for the sale of securities is not enforceable unless there is a writing signed by the party against whom enforcement is sought. Conn.Gen.Stat. § 42a–8–319(a). Yet, a contract may be enforceable without a writing to the extent that "payment has been made." Conn.Gen.Stat. § 42a–8–319(b). Provision of labor or services may constitute such payment for a stock option. *See Burns v. Gould,* 172 Conn. 210, 217, 374 A.2d 193, 200 (1977). In the present case, the promisee's full performance of the oral contract for the sale of securities takes the contract out of the statute altogether because payment in full for the stock has been made.

### IV

■ Appellant Bank further claims that the trial court should have applied Conn. Gen.Stat. § 36–88 to invalidate the stock option granted plaintiff. Section 36–88 of the Connecticut General Statutes deals with the situation in which a bank increases its authorized stock and issues that stock. The trial judge found no evidence

that the Bank's authorized stock was insufficient to cover the option. Moreover, the Bank is the party required to comply with the terms of § 36–88, and it may not in good conscience argue that because it failed to take the proper legal steps to make its promised consideration available, plaintiff may not enforce his claim after performing his part of the contract.

### V

■ Upon the jury's verdict, the trial court entered judgment for plaintiff in the amount of $57,560. The court based the award on a stipulation placed in the record at the close of the evidence. It provided that ·

> if plaintiff was successful he would be entitled to recover the difference between the cost of the stock as reflected in the option, that is $20 a share, and the amount which has thus far been distributed to stockholders based upon the sale of the assets which is $77 a share for a total of $57,000 which represents $57 a share times 1,000 shares.

Generally, a stipulation of fact that is fairly entered into is controlling on the parties and the court is bound to enforce it. *Stanley Works v. F.T.C.,* 469 F.2d 498, 506 (2d Cir.1972), *cert. denied,* 412 U.S. 928, 93 S.Ct. 2750, 37 L.Ed.2d 155 (1972); *Fenix v. Finch,* 436 F.2d 831, 837 (8th Cir.1971). But a court is not governed by a stipulation on a question of law. *Swift & Co. v. Hocking Valley Ry. Co.,* 243 U.S. 281, 289, 37 S.Ct. 287, 289, 61 L.Ed. 722· (1917). The stipulation in this case was not as to fact or law, it was on the issue of damages, which may be removed by stipulation from consideration by the jury.

■ There is no dispute over the method of calculation of damages in the stipulation. *See* 22 Am.Jur.2d *Damages* § 52 (1965) (citing authority for computing damages in actions for breach of contract to sell stock as of a date later than the date of the breach, as opposed to measuring the damages as of the date of the breach). Instead, defendant urges that the trial court should have considered plaintiff's

duty to mitigate damages under Connecticut law. *Willametz v. Goldfeld,* 171 Conn. 622, 627, 370 A.2d 1089 (1976). Ordinarily, it is left to the jury to determine whether plaintiff in the exercise of ordinary care and at reasonable expense could have mitigated defendant's damages. The fact that the stipulation on damages was silent about mitigation does not foreclose consideration of that issue. But here, counsel discussed matters of enhancement and reduction in their colloquy upon entering into the agreement on damages. Counsel for the Bank reserved the right to urge reduction only in connection with its statute of fraud performance argument. Since at that time the opportunity for plaintiff to mitigate damages by purchase of stock at $23 per share was long past, the matter of mitigation should have been called to the court's attention if the parties wished to preserve the argument.

Finally, defendant claims that it should be relieved from the effects of the stipulation to avoid manifest injustice, relying upon *Carnegie Steel Co. v. Cambria Iron Co.,* 185 U.S. 403, 22 S.Ct. 698, 46 L.Ed. 968 (1902). In *Carnegie* evidence was introduced contrary to the facts of a stipulation and the Supreme Court held that upon giving notice in time to prevent prejudice, a party may repudiate any fact inadvertently incorporated in its stipulation. *Id.* at 444, 22 S.Ct. at 714. Here neither side offered evidence on either damages or mitigation. It would have been an improvident exercise of discretion for the trial court to set aside the stipulation and thereby abrogate the intent of the parties who had entered into it. Plainly, it was not unreasonable to require defendant's attorney to have anticipated the mitigation issue at the time of the damage stipulation. *See, e.g.,* Fed.R.Civ.P. 16(c). We find no injustice in reaching this conclusion. First, there was no proof that any stock was available for plaintiff to purchase at $23 per share at the time he attempted to exercise his option. Second, the Bank cannot cast a duty upon Fisher, at the expense of his own interests, to make an expenditure in order to minimize the Bank's damages. *See Camp v. Cohn,* 151 Conn. 623, 627, 201 A.2d 187 (1964). At the time of the breach, there was a serious risk that negotiation for the sale of defendant's assets to the People's Savings Bank might fall through. It later became evident that the expenditure would have mitigated plaintiff's damages; but to require the innocent party to make such an expenditure compels him to incur risks beyond those for which he contracted. Hindsight may not serve as a basis to decrease damages plaintiff is otherwise entitled to recover.

Accordingly, we affirm the judgment.

VAN GRAAFEILAND, Circuit Judge, dissenting:

Every litigant, even a bank, is entitled to have its legal disputes tried and determined in accordance with correct legal procedures and established rules of law. Because that is not what is happening in the instant case, I dissent.

This case involves employee stock options, a device used to attract and retain capable personnel. When First Stamford Bank and Trust Company ("First Stamford") was organized in 1971, "Qualified Stock Options" were given to a number of its employees including appellee Fisher. Under the Internal Revenue Code, a "Qualified Stock Option" must provide that it is not exercisable after five years from the date it is granted. 26 U.S.C. § 422(b)(3). Moreover, "at all times during the period beginning with the date of the granting of the option and ending on the day 3 months before the date of such exercise," the grantee must be an employee of the granting corporation or a related corporation as described in the statute. *Id.* § 422(a)(2).

In accordance with the statutory requirements, Fisher's option, which gave him the right to purchase a total of 1,000 shares at $20 per share, provided that 200 shares were to be purchased between June 23, 1971, the option date, and June 23, 1972; 200 shares between June 23, 1972 and June 23, 1973; 200 shares between June 23, 1973

and June 23, 1974; 200 shares between June 23, 1974 and June 23, 1975; and 200 shares between June 23, 1975 and June 23, 1976. It also provided that Fisher had to be a full-time employee at the time he exercised his option, unless his employment was terminated prior to June 23, 1976 without fault on his part, in which event he would be entitled, within three months from the date of termination, to exercise his option as to the full number of shares available to him.

At the 1976 annual meeting of First Stamford's shareholders held on June 8, 1976, the shareholders "empowered" the board of directors to extend stock options theretofore granted to four employees including Fisher, Fisher's extension to be for a term of five and one-half years. However, the board never acted in accordance with the authority thus given it, and no hand was raised in protest, perhaps because the market value of the stock was substantially less than the option price.

Three years later, after Fisher had retired, the situation changed. On June 26, 1979, First Stamford's president sent each shareholder a letter which read in part as follows:

> We are pleased to inform you that the Board of Directors of the First Stamford Bank and Trust Company has just approved a resolution pursuant to which the assets and liabilities of FSB are to be sold to People's Savings Bank-Bridgeport. Under the proposed agreement (which we hope to reduce to writing within the next several weeks) stockholders can anticipate receiving a payment of between $65.00 and $70.00 per share.

One month thereafter, Fisher informed the Bank by letter that he had decided to exercise his stock option "in accordance with" the 1976 shareholders' resolution.

Two months later, the first complaint in this action was served. The pertinent provisions of that complaint read as follows:

> 4. On 6-23-71 the plaintiff, Charles Fisher, and the defendant, First Stamford Bank and Trust Company, entered into an Agreement which granted plaintiff a proprietary interest in the defendant to acquire options to purchase 1,000 shares of common stock of the defendant corporation, First Stamford Bank and Trust Company, at a price of $20.00 per share on or before 6-23-76. A copy of the Agreement is attached hereto as Exhibit A.
>
> 5. On or about 6-10-76 the defendant, First Stamford Bank and Trust Company, extended the stock option Agreement heretofore granted and attached hereto as Exhibit A, to the plaintiff, Charles Fisher, for a term of five and one half years at $20.00 per share commencing on 7-1-76.
>
> 6. On 7-30-79 the plaintiff, Charles Fisher, elected to exercise his stock option for 1,000 shares of the defendant corporation stock at $20.00 per share, or a total of $20,000, in accordance with the 6-10-76 resolution of the defendant corporation. A copy of plaintiff's letter electing to exercise his stock option of 1,000 of First Stamford Bank and Trust common stock at $20.00 per share or $20,000 is attached hereto as Exhibit B.

It is noteworthy that the complaint did not mention or even hint of any alleged oral agreement between Fisher and Norman Reader, First Stamford's president.

On May 4, 1981, Fisher served an amended complaint. Once again, no mention was made of an alleged oral agreement between Fisher and Reader. The complaint alleged that "[i]n June of 1976, at a time when the plaintiff was not an employee of the defendant, defendant agreed to extend and did extend the options previously granted to the plaintiff," and that "notwithstanding its agreement with the plaintiff, as aforesaid" the defendant refused to allow plaintiff to exercise his options.

Another sixteen months went by. On September 3, 1982, eight months after First Stamford's motion for immediate trial had been granted and the case placed on the ensuing jury calendar, Fisher was permitted to serve a second amended complaint. In this complaint, Fisher alleged for the

first time that, before he terminated his employment in January of 1976, the defendant promised to extend his option in consideration of his promise to render services to the defendant in connection with the opening of a new office later that year. This completely new theory of liability, which the district court permitted Fisher to propound on the very eve of the scheduled trial, begot a series of errors that has now culminated in my colleagues' cursory affirmance on a theory of ratification.

The existence *vel non* of this tardily-alleged oral agreement between Fisher and Reader, and Fisher's alleged compliance with its terms, were the only questions presented to the jury. As the district court itself described the first crucial question, "[t]his jury is solely going to be called upon to determine whether or not the Plaintiff has established the agreement that he says was entered into between him and the bank through Mr. Reader...." This question never should have gone to the jury.

The district court recognized, and Fisher did not dispute, that Reader was without authority to enter into a stock option agreement with the plaintiff. Connecticut law reserves to boards of directors the right to grant options and specify their terms. Conn.Gen.Stat. § 33–344(a). Fisher admittedly knew this to be so. Because Fisher failed to prove that First Stamford's board granted his alleged extended option or even knew of its existence, the Bank's motion for a directed verdict, made at the close of Fisher's case and renewed at the close of all the evidence, should have been granted. Regardless of the jury's answer to the court's interrogatory, the alleged extended option would be illegal and void. *See Levine v. Randolph Corp.*, 150 Conn. 232, 244, 188 A.2d 59 (1963). If the district court preferred to reserve decision on the directed verdict motions, it should have granted First Stamford's motion for judgment n.o.v., which technically was simply a renewal of its prior motions, *Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 167 n. 3 (2d Cir.1980).

Having determined to send the case to the jury, the district court should have granted First Stamford's request to instruct the jury that, under Conn.Gen.Stat. § 33–344(a), only First Stamford's board of directors lawfully could grant a stock option. A jury that is asked to determine whether a person entered into an apparently lawful agreement is going to view the matter in an entirely different light than if it were instructed that the agreement was unlawful. In the absence of knowledge to the contrary, "[f]inders of fact are permitted to make logical inferences of innocent behavior, because '[c]onformity to recognized standards of conduct is the usual and customary action of every member of the community.'" *Grey v. Heckler*, 721 F.2d 41, 49 (2d Cir.1983) (Van Graafeiland, C.J., dissenting) (citing *Matter of Callahan*, 142 Misc. 28, 34, 254 N.Y.S. 46 (1931), *aff'd*, 236 A.D. 814, 259 N.Y.S. 987 (1932), *aff'd*, 262 N.Y. 524, 188 N.E. 48 (1933)). Although it is not suggested that the district court should have instructed the jury concerning the inferences it must draw, it was prejudiciously erroneous for the court to deprive the jury of the facts from which it could make its own common sense determination whether a person such as Mr. Reader knowingly would violate the law.

It will not do to say that the district court's errors were rendered meaningless because judgment was entered against the Bank on a theory of ratification. Before an unauthorized agreement can be ratified, it first must be found to have been entered into.

Moreover, in determining the issue of ratification, the district judge viewed the evidence in the light most favorable to the plaintiff, just as if that entire issue had been submitted to the jury. Recognizing that the district court erred, my colleagues now proceed to determine the factual issue of ratification *de novo*, and conclude that the "totality of the circumstances" demonstrates that the board of directors ratified the purported agreement. I respectfully disagree.

In determining whether the doctrine of ratification has any role to play in this case, one must bear in mind two universally accepted rules that go to the very heart of this doctrine.

Rule 1:

*In order to ratify the unauthorized act of an agent, the ratification must be made by the principal with a full and complete knowledge of all the material facts connected with the transaction to which it relates.*

This Court has adhered to the foregoing rule:

Under the law of agency ratification can only occur when the principal, having knowledge of the material facts involved in a transaction, evidences an intention to ratify it.

*Breen Air Freight, Ltd. v. Air Cargo, Inc.,* 470 F.2d 767, 773 (2d Cir.1972), *cert. denied,* 411 U.S. 932, 93 S.Ct. 1901, 36 L.Ed.2d 392 (1973).

So also has the Supreme Court of Connecticut:

There is no ratification unless the party has full knowledge of all the facts, nor unless there is the intent to ratify.

*Goodwin v. The Town of East Hartford,* 70 Conn. 18, 42, 38 A. 876 (1897). *See also Botticello v. Stefanovicz,* 177 Conn. 22, 28, 411 A.2d 16 (1979); *Cohen v. Holloways', Inc.,* 158 Conn. 395, 408–09, 260 A.2d 573 (1969); *O'Connor v. Metropolitan Life Insurance Co.,* 121 Conn. 599, 609–10, 186 A. 618 (1936); *Lester v. Kinne,* 37 Conn. 9, 13–14 (1870); *Seeley v. North,* 16 Conn. 92, 97 (1844).

For additional discussions of the general rule, see 2A *Fletcher Cyc Corp.* § 756; 2 *Williston on Contracts 3d Ed.* § 278; 19 C.J.S. *Corporations* § 1015.

Rule 2:

*In determining whether a principal has full and complete knowledge of all the facts, one may not charge the principal with the knowledge of an agent who has been acting in excess of his authority.*

Connecticut follows the general rule of agency that knowledge of an agent, acting within the scope of his authority and in reference to a matter over which his authority extends, is knowledge of the principal. *City of West Haven v. United States Fidelity & Guaranty Co.,* 174 Conn. 392, 395, 389 A.2d 392 (1978). "This assumes, however, that the agent is acting within the scope of his authority." *Id.; see also Indiana Bicycle Co. v. Tuttle,* 74 Conn. 489, 492, 51 A. 538 (1902). This "scope of authority" limitation on the doctrine of imputed knowledge applies in full measure to any claim of ratification. This is the law both in Connecticut, *Cohen v. Holloways', Inc.,* 158 Conn. 395, 409, 260 A.2d 573 (1969), and elsewhere, *Kenneally v. First National Bank of Anoka,* 400 F.2d 838, 842 (8th Cir.1968), *cert. denied,* 393 U.S. 1063, 89 S.Ct. 716, 21 L.Ed.2d 706 (1969). *See also* Fletcher, *supra,* § 759; *Williston, supra,* § 278 at 270 n. 11; 19 C.J.S., *supra,* § 1015 at 489; 2A C.J.S., *Agency,* § 73(c) at 668 n. 6; *Restatement of Agency 2d* § 280.

Viewing the evidence in the light of the above clearly applicable rules of law, I am at a loss to determine how it can be held to "amply demonstrate" that First Stamford's board of directors ratified Fisher's alleged agreement with Reader. There is not one iota of proof in the record that any member of the fifteen-man board of directors, save the alleged wrongdoer, Reader, had any knowledge of Reader's alleged but clearly unauthorized acts, and it simply is wrong to impute Reader's knowledge to the other board members. In language that is strikingly apropos, Fletcher states:

Thus, the knowledge of the president of a corporation, who has signed a contract without authority of the directors, is not knowledge on the part of the corporation, where the other stockholders and directors have no knowledge of it.

Fletcher, *supra,* at § 759.

Moreover, ratification by the board cannot be inferred from the fact that Fisher worked as a bank "consultant" for several months in 1976. "[I]t is essential to im-

plied ratification from acceptance and retention of benefits that it and the acceptance of the benefits be with knowledge of all the material facts." Fletcher, *supra,* § 773 at 489. Fisher was paid $4,000 for his 1976 services, and "[r]atification cannot ... be inferred from acts which may be readily explained without involving any intention to ratify." 3 Am.Jur.2d *Agency,* § 170 at 555. *See Cyclone Fence Co. v. McAviney,* 121 Conn. 656, 661, 186 A. 635 (1936); *Lester v. Kinne, supra,* 37 Conn. at 13–14.

Finally, I fail to see how the shareholders' 1976 resolution empowering the board of directors to extend the stock options of four employees, a resolution that the board never acted upon, can be considered a ratification by the board of an unauthorized agreement between Reader and only one of the four employees.

Perhaps because as an appellate court we are unused to deciding factual issues, *see Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680, 691 (5th Cir.1971), my colleagues feel free to make factual determinations based on the "totality of the circumstances." Were I reviewing the majority opinion as an appellate judge, I would hold that, if my colleagues' findings were not clearly inadequate, they were clearly erroneous. As a member of the same panel, I can only dissent.

Although I am satisfied that the above discussed errors, standing alone, mandate reversal, I cannot conclude without expressing my differences with the majority concerning part performance under the statute of frauds. It is a rule of ancient vintage that, in order to take a case out of the statute, "[t]he acts done in part performance ... must be such as are necessarily to be imputed to the agreement, and should be done solely with a view to the identical agreement being performed that is sought to be enforced." *Lester v. Kinne, supra,* 37 Conn. at 14; *see also Van Epps v. Redfield,* 69 Conn. 104, 109–10, 36 A. 1011 (1897); *Verzier v. Convard,* 75 Conn. 1, 6–8, 52 A. 255 (1902). The conduct must be such as cannot "in the ordinary course of human conduct, be accounted for in any other manner than as having been done in pursuance of a contract." *Verzier* at 7 (quoting *Pomeroy on Contracts* § 108).

The record shows that Fisher sent the Bank monthly statements for his services as a consultant. The November 1976 bill in the amount of $172.54 bore the heading "Final Bill for Consulting Fee". This amount was paid on January 7, 1977 with a letter that stated:

> This represents total payment by First Stamford Bank and Trust Company as per your agreement, taking into consideration all expenses previously paid by the bank.

It turned out, however, that the total payments made to that date were $3,500 rather than $4,000. Accordingly, on January 13, 1977, Fisher sent the Bank a bill for $500 which read "Final Bill for Consulting regarding new Bedford St. Office." This also was paid.

Five years later, Fisher served a second amended complaint contending for the first time that his "final" bills were not final at all but, instead, his consulting services in connection with the new Bedford Street office were performed pursuant to an oral stock option agreement with Reader. Under established Connecticut law, permitting Fisher to prove an alleged verbal stock option contract under these circumstances would constitute a "virtual repeal" of the statute of frauds. *Van Epps v. Redfield, supra,* 69 Conn. at 110, 36 A. 1011. See also *Burnside & Co. v. Havener Securities Corp.,* 25 A.D.2d 373, 375, 269 N.Y.S.2d 724 (1st Dep't 1966) (per curiam).

For all the foregoing reasons, I dissent.